# Exhibit 1

**FORM 1.997. CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

---

**I. CASE STYLE**

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT,
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

SERIES 17-03-615
Plaintiff

Case # ___________________
Judge ___________________

vs.
PAR PHARMACEUTICALS, INC., HOLIDAY CVS, L.L.C, CVS PHARMACY, INC, CVS HEALTH CORPORATION, ENDO HEALTH SOLUTIONS, INC, ENDO PHARMACEUTICALS, INC
Defendant

---

**II. AMOUNT OF CLAIM**

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐ $8,000 or less
☒ $8,001 - $30,000
☐ $30,001- $50,000
☐ $50,001- $75,000
☐ $75,001 - $100,000
☐ over $100,000.00

**III. TYPE OF CASE** (If the case fits more than one type of case, select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
- ☐ Business governance
- ☐ Business torts
- ☐ Environmental/Toxic tort
- ☐ Third party indemnification
- ☐ Construction defect
- ☐ Mass tort
- ☐ Negligent security
- ☐ Nursing home negligence
- ☐ Premises liability—commercial
- ☐ Premises liability—residential

☐ Products liability
☐ Real Property/Mortgage foreclosure
- ☐ Commercial foreclosure
- ☐ Homestead residential foreclosure
- ☐ Non-homestead residential foreclosure
- ☐ Other real property actions

☐Professional malpractice
- ☐ Malpractice—business
- ☐ Malpractice—medical
- ☐ Malpractice—other professional

☐ Other
- ☐ Antitrust/Trade regulation
- ☐ Business transactions
- ☐ Constitutional challenge—statute or ordinance
- ☐ Constitutional challenge—proposed amendment
- ☐ Corporate trusts
- ☐ Discrimination—employment or other
- ☐ Insurance claims
- ☐ Intellectual property
- ☐ Libel/Slander
- ☐ Shareholder derivative action
- ☐ Securities litigation
- ☐ Trade secrets
- ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☒ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
  ☐ Residential Evictions
  ☐ Non-residential Evictions
☐ Other civil (non-monetary)

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order. Yes ☐ No ☒

**IV. REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V. NUMBER OF CAUSES OF ACTION:** [ ]
(Specify)

2

**VI. IS THIS CASE A CLASS ACTION LAWSUIT?**
☐ yes
☒ no

**VII. HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
☒ no
☐ yes If "yes," list all related cases by name, case number, and court.

**VIII. IS JURY TRIAL DEMANDED IN COMPLAINT?**
☒ yes
☐ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ JOHN H RUIZ Fla. Bar # 928150
Attorney or party (Bar # if attorney)

JOHN H RUIZ 11/13/2020
(type or print name) Date

IN THE COUNTY COURT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

SERIES 17-03-615, a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company,

Plaintiff,

v.

CASE NO:

PAR PHARMACEUTICAL, a Delaware corporation, and ENDO HEALTH SOLUTIONS, INC., a Delaware corporation, ENDO PHARMACEUTICALS, INC., a Delaware corporation, HOLIDAY CVS, LLC, a Florida corporation, CVS PHARMACY, INC., a Rhode Island corporation, and CVS HEALTH CORPORATION, a Delaware corporation,

Defendants.
_________________________________/

**PLAINTIFF'S COMPLAINT FOR DAMAGES**
**<u>AGAINST DEFENDANTS</u>**

**COMES NOW**, Plaintiff, SERIES 17-03-615, a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company, as assignee of Avmed, Inc. (hereinafter referred to as "*Plaintiff*"), brings this Action against Defendants—PAR PHARMACEUTICAL; ENDO HEALTH SOLUTIONS, INC.; ENDO PHARMACEUTICALS, INC.; HOLIDAY CVS, L.L.C.; CVS PHARMACY, INC.; and CVS HEALTH CORPORATION (hereinafter collectively referred to as "*Defendants*")[1]—pursuant to Florida Stat. § 501.201, *et seq*., and avers the following:

---

[1] Defendants are divided into two (2) distinct categories—(a) the manufacturers of the Opioids prescribed to the Enrollee at issue in this Action, which are referred to herein as the "**Manufacturing Defendants**," and (b) the pharmacies and/or distributors that dispensed those

## I. Nature of the Plaintiff's Action

1. Plaintiff, as the assignee of Avmed, Inc. (hereinafter referred to as "**Avmed**"),[2] commences this Action against Defendants, individually and collectively, for violations of Florida's Deceptive and Unfair Trade Practices Act (*FDUTPA*), Fla. Stat. § 501.201, *et seq.*, arising from Defendants' unlawful, deceptive and unfair trade practices and conduct relating to the manufacturing, marketing, and dispensing of oxycodone hydrochloride,[3] particularly oxycodone tab 30 mg and oxycodone tab HCL 30 mg, to an Enrollee of Avmed ("**Enrollee J.W.B.**"[4]).

2. The Manufacturing Defendants' deceptive and unfair trade practices include, but are not limited to, the following: (1) the promulgation and spread of misinformation; (2) the direct and indirect unethical and unbiased influence on third-parties; (3) deliberate mischaracterization of clinical studies; and (4) the false perception of safety, efficiency, and lack of side effects regarding the relevant Opioids. The Manufacturing Defendants' deceptive and unfair practices and conduct resulted in Avmed providing healthcare coverage to an Enrollee that was

---

Opioids to the Enrollee, which are referred to herein as the "**Pharmacy Defendants**." The Manufacturing Defendants and the Pharmacy Defendants are referred to, collectively, as "**Defendants**." The "Manufacturing Defendants" consist of the following: Par Pharmaceutical ("**Par**"), Endo Health Solutions, Inc. ("**EHS**"), and Endo Pharmaceuticals, Inc. ("**EPI**"). The "Pharmacy Defendants" consists of HOLIDAY CVS, L.L.C., CVS PHARMACY, INC. and CVS HEALTH CORPORATION (collectively "**CVS**").

[2] As set forth in greater detail below, Plaintiff has been assigned the claims of Avmed, a Medicare Advantage Organization ("MAO"), pursuant to a contract for which is identified by the Centers for Medicare and Medicaid Services ("CMS") as CMS Contract ID number of H1016. The use of "**Avmed**" includes all alternative corporate names.

[3] The term "**Opioid**" is explicitly used hereinafter to refer to oxycodone tab 30 mg and oxycodone tab HCL 30 mg unless specifically identified otherwise.

[4] In compliance with the Health Insurance Portability and Accountability Act (HIPAA), this public filing embraces the initials of the particular Enrollee to maintain confidentiality. Upon entry of a qualified HIPAA protective order, the full identity of Enrollee J.W.B. will be disclosed to Defendants.

unilaterally subject to the Defendants' deceptive conduct and Avmed being financially responsible for the individual and collective wrongdoings of Manufacturing Defendants.

3. The Pharmacy Defendants' deceptive and unfair trade practices include, but are not limited to, the following: (1) dispensing Opioids without a legitimate medical purpose; (2) dispensing of suspicious orders in terms of quantity and frequency, (3) failing to report suspicious orders; and (4) systematically failing to comply with the licensing and administrative law requirements for the State of Florida. These acts of deceptive and unfair conduct perpetuated by the Pharmacy Defendants, individually and collectively, were unbeknownst to Avmed, therefore resulting in the Enrollee obtaining Opioids contrary to Florida laws and regulations, and subsequently developing an opioid dependency subsequent to Pharmacy Defendants dispensing the subject Opioids.

4. Plaintiff's Action derives from an irrevocable assignment between Avmed and a designated series of Plaintiff, where Avmed assigned to Plaintiff the legal rights of recovery for healthcare services provided to Enrollee J.W.B., who at all material times herein was an enrollee of a Medicare Advantage ("*MA*") plan administered by Avmed.

## III. PARTIES

5. Plaintiff, SERIES 17-03-615, a designated series of MSP Recovery Claims, Series LLC is a duly organized and existing Delaware series limited liability company formed on February 14, 2017, and registered to do business in the State of Florida with a principal place of business located at 2701 S. LeJeune Road, 10th Floor, Coral Gables, Florida, 33134.

6. Defendant PAR PHARMACEUTICAL, INC. is, on information and belief, a Delaware corporation with its principal place of business located in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a wholly-owned subsidiary of Par Pharmaceutical Companies, Inc. f/k/a

Par Pharmaceutical Holdings, Inc. (collectively hereinafter referred to as "**Par Pharmaceutical**" or "**Par**").[5]

7. Defendant ENDO HEALTH SOLUTIONS INC. ("**EHS**") is, on information and belief, a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

8. Defendant ENDO PHARMACEUTICALS, INC. ("**EPI**") is, on information and belief, a wholly-owned subsidiary of EHS and a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

9. Defendant HOLIDAY CVS, L.L.C. is, on information and belief, a Florida corporation with its principal place of business located in Rhode Island, operating retail pharmacies across the United States, including in Miami-Dade County.

10. Defendant CVS PHARMACY, Inc., is, on information and belief, a Rhode Island corporation with its principal place of business located in Rhode Island, and operates retail pharmacies across the United States, including Miami-Dade County. CVS Pharmacy, Inc. is the corporate parent of Holiday CVS, L.L.C. and CVS Pharmacy, Inc. directs the affairs and corporate oversight of Holiday CVS L.L.C.

11. Defendant CVS HEALTH CORPORATION is, on information and belief, a Delaware corporation with its principal place of business in Rhode Island, and operates retail pharmacies across the United States, specifically including Miami-Dade County. CVS Health Corporation is the corporate parent and directs the affairs and corporate oversight of all CVS entities,

---

[5] In September of 2015, Par Pharmaceutical was acquired by Endo International plc and Par Pharmaceutical is an operating company of Endo International plc. EHS, EPI and Par Pharmaceutical as well as its DEA registrant subsidiaries and affiliates (collectively "**Endo**") manufacture various opioids sold nationally, specifically including Miami-Dade County. Whether directly or through its subsidiaries, Endo also manufactures and sells generic opioids, such as Par Pharmaceutical and Qualitest Pharmaceuticals, Inc.

including CVS Pharmacy Inc., and Holiday CVS L.L.C. (collectively hereinafter referred to as "**CVS**").

## IV. JURISDICTION AND VENUE

***Subject Matter Jurisdiction***

12. Pursuant to Fla. Stat. § 26.012, this Action seeks actual damages of less than $30,000 for Defendants', individual and collective, violations of Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. §501.201, *et al.*, and thus subject matter jurisdiction vests within this Honorable Court.

***Personal Jurisdiction***

13. Defendants are foreign entities that are registered to transact business in the State of Florida and are otherwise subject to personal jurisdiction:

(i) pursuant to Fla. Stat. § 48.193:

(a) Defendant PAR PHARMACEUTICAL manufactured oxycodone hydrochloride to be sold in the State of Florida that required Par Pharmaceutical to obtain a permit from the Florida as required under Fla. Stat. § 499.001(1)(c);

(b) Defendant PAR PHARMACEUTICAL operated, conducted, engaged in and/or carried out the sales and/or promotion of pharmaceuticals in Florida[6];

---

[6] Between 2006 and 2014, Defendant Par Pharmaceutical sold over 30 million dosage units in Miami-Dade County alone, with Endo selling an additional 1.8 million units. The Washington Post, *The Opioid Files: Drilling Into the DEA's Pain Pill Database*, https://www.washingtonpost.com/graphics/2019/investigations/dea-pain-pill-database/?itid=lk_inline_manual_3 (last viewed November 13, 2020) (Microsoft Excel spreadsheet with Miami-Dade dispensing data available for download).

(c) Defendant ENDO HEALTH SOLUTIONS manufactured oxycodone hydrochloride to be sold in the State if Florida that required EHS to obtain a permit from the State as required under Fla. Stat. § 499.001(1)(c);

(d) Defendant ENDO HEALTH SOLUTIONS operated, conducted, engaged in and/or carried out the sales and/or promotion of pharmaceuticals in Florida;

(e) Defendant ENDO PHARMACEUTICALS, INC. manufactured oxycodone hydrochloride to be sold in the State of Florida that required EPI to obtain a permit from the State as required under Fla. Stat. § 499.001(1)(c);

(f) Defendant ENDO PHARMACEUTICALS, INC. operated, conducted, engaged in and/or carried out the sales and/or promotion of pharmaceuticals in Florida;

(g) CVS dispensed controlled substances in Florida, requiring CVS to obtain a license from the State of Florida as required under Fla. Stat. § 465.007;

(h) CVS operated, conducted, engaged in and or carried out the distribution of pharmaceuticals in Florida; and

(ii) pursuant to Fla. Stat. § 48.193(1)(a)(6)(b), all of Defendants' products and/or services were consumed within this State in the ordinary course of commerce, trade, or use that caused injury within the State of Florida.

14. Each Defendant has purposefully availed itself of the privilege of conducting business in the State of Florida by registering to do business in the State and obtaining licensure from the State to carry out Defendants' business. Due to such conduct within this jurisdiction, each Defendant should have reasonably anticipated being hauled into court in the State of Florida.

***Venue***

15. Pursuant to Fla. Stat. § 47.051, venue is proper in Miami-Dade County, Florida, as it is the county in which the causes of Action herein accrued. The Assignment to Plaintiff occurred in Miami-Dade County. The relevant healthcare services occurred within Miami-Dade County. The opioid prescription was issued and dispensed in Miami-Dade County as well as the opioid dependency diagnoses and treatment. The effects and ramifications of all Defendants' wrongdoings, individually and collectively, occurred in Miami-Dade County.

## V. GENERAL ALLEGATIONS

***Avmed & Enrollee J.W.B.***

16. Plaintiff's Assignor, Avmed, is a duly organized Florida insurance company and HMO/PPO Medicare Advantage Organization ("*MAO*") pursuant to its contract with CMS (CMS Contract ID number H1016).

17. Plaintiff's Assignor, Avmed provides enlisted enrollees with HMO/PPO MAO healthcare coverage pursuant to its contractual agreement with CMS, where such Enrollees are direct consumers of manufactured opioids. Avmed directly provides such healthcare coverage to these enrollees.

18. Between 2015 and 2018, Enrollee J.W.B. was enrolled in a Medicare Advantage (MA) plan pursuant to Avmed's CMS Contract Number H10106.

19. On or about January 13, 2015, Enrollee J.W.B. was prescribed oxycodone hydrochloride (oxycodone tab 30 mg and oxycodone tab HCL 30 mg)[7] manufactured by Manufacturing Defendants and dispensed by Pharmacy Defendants within Miami-Dade County.

20. On June 1, 2016, Enrollee J.W.B. was diagnosed with an opioid dependency, with additional opioid dependency diagnoses occurring throughout the claims period.

21. The opioid dependency diagnoses of Enrollee J.W.B. required opioid dependency-related healthcare services, where Avmed provided the coverage according to its CMS contract.

***Avmed & Plaintiff's Irrevocable Assignment***

22. On June 26, 2019, Avmed, Inc. entered into a Claims Purchase Agreement ("*Claims Purchase Agreement*") with Series 17-03-615, a designated series of Plaintiff, whereby Avmed irrevocably assigned all rights of recovery to a designated series of Plaintiff. The Assignment states as follows:

> Pursuant to the Claims Purchase Agreement, the Assignor irrevocably assigns, transfers, coneys, sets over and delivers to MSP Recovery, and any of its designated series, successors and assigns, any and all of Assignor's right, title, ownership and interest in and to (i) all Claims existing on the date hereof, whether based in contract, tort or statutory right, and all related recovery rights arising from and related to the claims data transferred to MSP Recovery (or its affiliates or service providers, including MSP Recovery, LLC), and (ii) any and all causes of Action, claims, and demands of any nature whatsoever relating to payments for health care services provided to Assignor's members and enrollees, and legal or equitable rights (including, but not limited to, subrogation) to pursue and/or recover monies related to the Claims that Assignor had, may have had, or has asserted against any primary payer any party in connection with the Claims; and (iii) all causes of Action, claims, rights and demands of any nature whatsoever, legal or equitable, against primary payers, Responsible Parties and/or third parties that may be liable to Assignor arising from or relating to the Claims, including claims under consumer protection statutes and laws (all of the

[7] The National Drug Code (NDC) of oxycodone tab 30 mg and oxycodone tab HCL 30 mg manufactured by Defendant Par Pharmaceutical is 603499221.

> items set forth in (i)-(iii), the "Assigned Claims") . . . . The assignment of the Assigned Claims set forth herein is irrevocable and absolute.

23. These particular Enrollees include the right to recover for Enrollee J.W.B.'s medical items and services.

24. The Assigned Claims include the right to pursue and recover payments made by Avmed on behalf of Enrollee J.W.B.

25. According to the Claims Purchase Agreement, Avmed and Assignee would enter into a "Stand-Alone Assignment Agreement," which was executed on August 16, 2019, by Avmed and Plaintiff. The language from this Stand-Alone Assignment Agreement states as follows:

> NOW THEREFORE, in consideration of the recitals stated herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its designated series, sucessors and assigns, any and all of Assignor's right, title, ownership and interest in and to (i) all Claims existing on the date hereof, whether based in contract, tort, or statutory right, and all related recovery rights arising from and related to the claims data transferred to MSP Recovery (or its affiliates or service providers, including MSP Recovery, LLC), and (ii) any and all causes of Action, claims and demands of any nature whatsoever relating to payments for health care services provided to Assignor's members and enrollees, and legal or equitable rights (including, but not limited to subrogation) to pursue and/or recover monies related to the Claims that Assignor had, may have ad, or has asserted against any party in connection with the Claims; and (iii) all causes of Action, claims, rights and demands of any nature whatsoever, legal or equitable, against primary payers, Responsible Parties and/or third parties that may be liable to Assignor arising from or relating to the Claims, including claims under consumer protection statutes and laws (all of the claims set forth in (i)-(iii), the "Assigned Claims").

26. The Assigned Claims from the Stand-Alone Agreement and Claims Purchase Agreement include the right to pursue and recover payments made by Avmed on behalf of Enrollee J.W.B. Plaintiff, as assignee of Avmed's claim right of recovery for Enrollee J.W.B., brings this Action.

## VI. COUNT I AGAINST ALL MANUFACTURING DEFENDANTS: FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FDUTPA), FLA. STAT. § 501.201, ET. SEQ.

***Deceptive and Unfair Trade Practices and Conduct***

27. Plaintiff hereby adopts and incorporates by reference paragraphs one (1) through twenty-six (26), as well as any footnotes and Exhibits attached hereto, as fully set forth herein.

28. This Action arises from the Manufacturing Defendants' unlawful, deceptive and unfair trade practices, individually and collectively, relating to the manufacturing and marketing of Opioids and the ultimate sale. Enrollee J.W.B. was prescribed oxycodone hydrochloride (oxycodone tab 30 mg and oxycodone tab HCL 30 mg). These Opioids are manufactured and marketed by Manufacturing Defendants in violation of the Florida Food, Drug and Cosmetic Act (*Florida's FDCA*[8]), including, but not limited to, Fla. Stat. § 499.005(4)-(5)[9], which in return constitutes a violation of *FDUTPA*, Fla. Stat. § 501.201, *et seq*.[10] The manufacturing and marketing of oxycodone hydrochloride (oxycodone tab 30 mg and oxycodone tab HCL 30 mg) involves trade or commerce within the meaning of FDUTPA.

29. Defendant Par Pharmaceuticals manufactures, markets, and sells oxycodone hydrochloride[11] (oxycodone tab 30 mg and oxycodone tab HCL 30 mg).

---

[8] Florida's FDCA is intended to safeguard public health and promote the public welfare by protecting the public from injury by product use and by merchandising deceit involving drugs, devices and cosmetics. Fla. Stat. § 499.002(1)(a).

[9] The sale, distribution, purchase, trade, holding, or offering of any drug, device, or cosmetic is prohibited under Fla. Stat. § 499.005(4). The dissemination of any false or misleading advertisement of a drug, device, or cosmetic is prohibited under Fla. Stat. § 499.005(5).

[10] Florida Courts have long recognized that violations of a statute are sufficient to establish a violation of FDUTPA, including in some instances where a violation of a statute is a *per se* violation of FDUTPA.

[11] As defined in Florida's FDCA, the product of Defendant—the oxycodone hydrochloride (oxycodone tab 30 mg and oxycodone tab HCL 30 mg)—falls within the definition of a 'drug.' *See* Fla. Stat. § 499.003(17).

30. Defendants' conduct, individually and collectively, would not only affect Plaintiff's Assignor, but also is likely to deceive a medical professional or consumer acting reasonably in the same circumstances.

31. Upon information and belief, Defendant Par Pharmaceutical provided funding for and participated in 'schemes' with its parent corporation (Endo) to spread misinformation regarding the clinical efficiency of oxycodone hydrochloride.

32. Upon information and belief, Defendants' misinformation, individually and collectively, took the form of branded and unbranded marketing initiatives, including, but not limited to, funding of front groups—such as the American Pain Society [12] and National Initiative on Pain Control ("*NIPC*"). [13] Upon information and belief, these organizations and similar organizations used by Defendants had an insidious purpose of disseminating falsehoods and downplaying negative side effects to healthcare professionals and the general public to increase opioid portfolios.

33. The individual and collective spread of misinformation by Manufacturing Defendants included the front group NIPC. NIPC's misrepresentations include, but are not limited to: (1) representations that opioid addiction is rare when used for acute pain treatment patients who do not have a history of addiction; (2) describing '*pseudoaddiction*' as a patient's pattern of drug-seeking behavior and suggesting such behavior is merely a sign of 'inadequate pain management' and the 'behaviors [will] resolve when the pain medication is increased and appropriate analgesia [(the inability to feel pain)] is obtained';[14] and (3) a patient's level of function should improve, allowing the patient to participate in activities of daily living, such as work and hobbies, after long-term opioid use. These misrepresentations were made

---

[12] *See* Exhibit 1.
[13] *See* Exhibit 2.
[14] *See* Exhibit 2, Page 4.

regarding all opioid products, including Defendants' branded and generic products. These statements include representations regarding the particular oxycodone prescribed to Enrollee J.W.B.

34. Upon information and belief, Endo published an abundance of misinformation using multiple means of media. Around 2006, Defendant Endo published a marketing brochure containing misinformation of pseudoaddiction that perpetuated an unrecognized clinical diagnosis in healthcare.[15] Another source investigated and published by Endo called *Understanding Your Pain: Taking Oral Opioid Analgesics*, references opioids manufactured by other companies with the same regularity as its own products.[16] Included in this brochure are listed equivalents to the branded Opioid Enrollee J.W.B. was prescribed.[17]

35. Manufacturing Defendants, individually and collectively, disseminated training slides to sales representatives ostensibly stating that analgesic use should include "[o]pioid rotation – rotation from one opioid to another can result in significant improvement in analgesia".[18]

36. Misinformation disseminated to internal personnel of the company stated and implied that there is not a ceiling for opioid dosing, and opioid addiction is unlikely to develop.[19] In the thirty-nine (39) page training presentation, there is no reference in the first thirty-three (33) pages to a single Endo product, rather they reference Opioids as a class of pharmaceuticals, which includes both branded and generic Opioids.

37. Results of ethical and unbiased studies would reveal that Opioids are addictive, quantifiable limits to dosages, and that pseudoaddiction was simply a marketing deviation to divert

---

[15] Pseudoaddiction was the marketing ploy that Opioid manufacturers touted in lieu of informing the general public that Opioids are in fact addictive.
[16] *See* Exhibit 3, at 3; stating ("[a]ddiction is not when a person develops 'withdrawal' (such as abdominal cramping or sweating) after the medicine is stopped quickly or the dose is reduced by a large amount").
[17] *See* Exhibit 3, at 3.
[18] *See* Exhibit 4, at 29.
[19] *See* Exhibit 4, at 31.

prescribers and patients from acknowledging the negative ramifications of its products. Medical practitioners and the general public, as a whole, are at a disadvantage regarding information based on the characteristics of Defendants' manufactured and distributed drugs. Enrollee J.W.B.'s diagnosis of being opioid dependent illustrates the consequences of Defendants' deceptive and unfair practices, and Defendants neglect towards its products' consumers.

38. Upon information and belief, Endo knew any promotional efforts relating to its branded products would ultimately profit its generic business due to laws requiring that where a generic version of a branded pharmaceutical is available, the generic is automatically substituted for the branded product by the pharmacy, like in Florida.[20]

39. Upon information and belief, Endo executives knew that educational programs that are not done through an 'independent third-party' will be perceived as inappropriate promotions and crafted a marketing plan to circumvent that issue. Regardless Endo determined to use a marketing plan to not distinguish between branded and generic opioid promotion in efforts to facially distort the improper promotion and marketing behavior.

40. Upon information and belief, Manufacturing Defendants were one and the same regarding misrepresentations of marketing materials. Defendant Par Pharmaceutical either voluntarily aided in the misrepresentations in unbranded marketing, including the usage of front groups, or was directed to do so at the behest of Endo—as any profits garnered by Par would inevitably enrich Endo's bottom line and/or trickle through its corporate entities.

41. Manufacturing Defendants' conduct and practices, individually and collectively, within the State are deceptive and unfair practices in the course of trade.

---

[20] Section 465.025, Florida Statutes.

42. On information and belief, Defendants knew that each of the above representations were false at the time of the representation and planned to hide those representations. Defendants knew that: (1) oxycodone hydrochloride is addictive, especially when taken for long-term chronic injuries, (2) the marketing term “pseudoaddiction” was a method to divert (a physician’s attention) from actual addiction symptoms, and (3) that long term use of opioids does not improve a patient’s function.

43. Defendants’ misrepresentations regarding the addictive nature of opioids and that patients can take opioids safely for chronic long-term use, were central to the marketing and prescribing of opioids.

44. Defendants’ misrepresentations, individually and collectively, of its’ products were false, misleading, and likely to deceive based on the unilateral withholding of information by Manufacturing Defendants, which includes scientific evidence, and Manufacturing Defendants’ deceptive and sinister marketing tactics and procedures.

45. Plaintiff had no way of knowing about Defendants’ use of Front Groups or that Defendants’ marketing and/or training materials were deceptive in nature relating to Enrollee J.W.B. until the Manufacturer Defendants’ wrongdoing was exposed to the public.

46. Accordingly, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to claims as to all of the Opioids identified herein as the true nature of the Opioids were known exclusively by Manufacturing Defendants.

47. Defendants were under a continuous duty to disclose the true character and nature of its Opioids, including the addictive properties; however, Defendants’ breached this duty, opting to disguise the true addictive nature of its Opioids.[21]

---

[21] *See* Section 499.005(5), Florida Statutes.

48. Manufacturing Defendants' violations of FDUTPA offend Florida's public policy, are immoral, unethical, oppressive and unscrupulous, as well as malicious, wanton and a manifestation of ill will, thereby causing substantial injury to Plaintiff's Assignor.

49. On or about January 13, 2015, Enrollee J.W.B., while an enrollee of Avmed under Avmed's contract with CMS, was prescribed Defendants' product—oxycodone hydrochloride.

50. Due to Avmed contractual obligations with CMS, Avmed was required to provide healthcare and prescription drug coverage and remitted payment for Enrollee J.W.B's Opioid prescriptions, encompassing Defendants' products forty-nine (49) times between January 13, 2015 and November 9, 2018.

51. Enrollee J.W.B. was diagnosed as opioid dependent that required healthcare services and treatment between 06/01/16 and 06/01/2018.

52. Due to Avmed's contractual obligations with CMS, Avmed provided healthcare coverage and remitted payment for opioid dependent healthcare services and treatment for Enrollee J.W.B.'s opioid dependency treatment between 06/01/16 and 06/01/2018.

53. Avmed issued payment for oxycodone hydrochloride (oxycodone tab 30 mg, and oxycodone tab HCL 30 mg) prescribed to Enrollee J.W.B. that directly derived from Defendants' deceptive and unfair trade practices regarding the manufacturing and marketing of Opioids in violation of the FDCA. Without Defendants' violation of FDCA, Plaintiff's Assignor would not have issued payment for the particular Opioid, where Avmed sustained actual damages.

54. But for Defendants' false and deceptive marketing, Enrollee J.W.B. would have not been prescribed the subject Opioids, and rather would have been prescribed a non-narcotic pain reliever, and Plaintiff's Assignor would have not reimbursed for any Opioids for Enrollee J.W.B.

55. But for Defendant's false and deceptive marketing and had Enrollee J.W.B. been prescribed a non-narcotic pain reliever, Enrollee J.W.B. would have never developed an Opioid Dependency, which required Plaintiff's Assignor to provide additional medical services and care in relation to that dependency diagnosis.

56. Violations of Fla. Stat. § 499.005 do give rise to violations of FDUTPA, especially in instances, such as here, concerning the fraudulent marketing of a drug to medical professionals and the general public.

57. Defendants' sale, promotion, marketing, advertising, distribution, and manufacturing of oxycodone hydrochloride (oxycodone tab 30 mg and oxycodone tab HCL 30 mg) resulted in Enrollee J.W.B. being prescribed Opioids for non-cancer, chronic-long term pain management, where Avmed issued payments for the Opioids that later produced an opioid dependency requiring even further treatment and care at the financial expense of Avmed and the wellbeing of Enrollee J.W.B.

58. But for Defendants' deceptive and unfair conduct, Avmed would not have incurred the expenses for Opioids and for treatment of Opioid dependency on behalf of Enrollee J.W.B. from 06/01/2016 and 6/1/2018.

59. Plaintiff's Assignor, Avmed, has been damaged as a direct and proximate result of Defendants' violations of FDUPTA through Defendants' deceptive and unfair trade practices, namely their noncompliance with the FDCA.

60. Plaintiff's Assignor, Avmed, issued payment for the Manufacturing Defendants' Opioids dispensed to Enrollee J.W.B. during the relevant time period. Avmed issued payment for the Manufacturing Defendants' Opioids dispensed to Enrollee J.W.B. forty-nine (49) times from January 13, 2015 and November 9, 2018. Further, Plaintiff's Assignor issued payment for

Enrollee J.W.B.'s reasonable and necessary medical services due to Enrollee J.W.B.'s dependency diagnoses between 06/01/2016 and 6/1/2018.

61. Plaintiff's Assignor, Avmed, incurred actual monetary damages of less than thirty-thousand dollars ($30,000) relating to Defendants' unfair and deceptive trade practices individually and collectively related to Enrollee J.W.B.

62. The Manufacturing Defendants deceptive and unfair trade practices, both individually and collectively, have rendered the Manufacturing Defendants' products valueless, such that Plaintiff is entitled to restitution in an amount not less than the price of Enrollee's opioid prescriptions.

63. Defendants' misrepresentations have not only caused Plaintiff's Assignor to pay for the valueless Opioid in question, but further, forced Plaintiff's Assignor to pay for opioid dependency services and treatment that were reasonable and necessary in light of the dependency diagnoses of Enrollee J.W.B.

64. In the alternative, Defendants' misrepresentations resulted in Avmed sustaining actual damages calculated by the difference between the premium price for an Opioid prescription and that of an opioid alternative, such as an nonsteroidal anti-inflammatory drugs ("NSAID") pain reliever and the additional costs of the reasonable and necessary services that Avmed provided to Enrollee J.W.B. as a result of J.W.B.'s dependency diagnoses.

65. At all times material hereto, Plaintiff's actual damages, including the alternative methodology, are less than $30,0000.

66. Pursuant to Fla. Stat. § 501.2105, Plaintiff seeks its reasonable attorney's fees and costs in prosecuting this Action.

WHEREFORE, Plaintiff, SERIES 17-03-615, respectfully requests this Honorable Court to enter Judgment against the Manufacturing Defendants for damages, sustained by Plaintiff in relation to Defendant's violations of FDUTPA, including the reasonable attorney's fees and costs in prosecuting this Action, and any other relief this Honorable Court deems just and proper under the circumstances.

## VII. COUNT II AGAINST PHARMACY DEFENDANTS, HOLIDAY CVS, L.L.C., CVS PHARMACY, Inc., and CVS HEALTH CORPORATION. FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FDUTPA), FLA. STAT. § 501.201, ET. SEQ.

67. Plaintiff hereby adopts and incorporates by reference paragraphs one (1) through twenty-six (26), as well as any footnotes and Exhibits attached hereto, as fully set forth herein.

68. Count II of this Complaint is against Pharmacy Defendants, arising from Defendants' unlawful, deceptive and unfair trade practices, individually and collectively, relating to the dispensing and/or distribution of controlled substances to Enrollee J.W.B.

69. Defendants operate retail pharmacies throughout the State, including CVS Store #05118.[22] CVS dispenses both controlled and non-controlled substances, to individuals and institutions throughout the state.

70. Between 2015 and 2019, Enrollee J.W.B. was enrolled within a Medicare Advantage ("MA") plan administered by Avmed, making Avmed responsible for Enrollee's health related expenses and costs.[23]

---

[22] CVS Store #05118 has a Pharmacy License with the State of Florida (license no. PH20521) and has a National Provider Identifier (NPI) of 1580960469. The retail pharmacy address of CVS #05118 is 28740 S. Dixie Highway, Homestead, Florida, 33033.

[23] When MAO's such as Plaintiff's Assignor refer their beneficiaries to pharmacies to have a prescription filled, MAO's depend on pharmacies such as Defendants to do their required due diligence to protect beneficiaries and also to make sure MAO's are not being taken advantage of by footing the bill for illicit drug addictions.

71. Avmed provides enlisted enrollees with HMO/PPO MAO healthcare coverage pursuant to its contractual agreement with CMS.

72. From January 2015 through June 2019, Defendants, dispensed opioids to J.W.B. on 111 occasions.

73. Upon dispensing the Opioid, Defendants became in violation of various Florida laws and regulations, which in return constitutes a violation of FDUTPA, Fla. Stat. § 501.201, *et seq*.

74. Between January 13, 2015, and June 18, 2019, Enrollee J.W.B. presented numerous red flags to Pharmacy Defendants' at the time Defendants dispensed controlled substances to Enrollee J.W.B.

75. On or about the same day that Defendants dispensed Opioids to Enrollee J.W.B., Defendants also dispensed various drugs from the benzodiazepine class of drugs to Enrollee J.W.B.

76. The dispensing of an Opioid and any benzodiazepine class of drug constitutes a red flag for a pharmacy; when faced with these red flags, the pharmacy has a duty to follow up with the provider regarding the combination of drugs andprescriptions.[24]

77. Pharmacy Defendants failed to comply with its statutory obligation and duty to report suspicious orders in terms of quantity and frequency. Pharmacy Defendants failed to report the suspicious Opioid prescriptions of Enrollee J.W.B. to the appropriate authorities, or at a minimum to Avmed. This failure to report was either subject to Pharmacy Defendants failure

---

[24] Studies have highlighted that 60 percent of overdose deaths involve the usage of both Opioids and benzodiazepines. Gomes T, Mamdani MM, Dhalla IA, Paterson JM, Juurlink DN. Opioid dose and drug-related mortality in patients with nonmalignant pain. Arch Intern Med. 2011;171(7):686-691. doi:10.1001/archinternmed.2011.117. The National Institute on Drug Abuse recommends that clinicians avoid prescribing and Opioids whenever possible, this combination has even earned black box warnings for every drug found in their respective classes relating to this combination of drugs. https://www.drugabuse.gov/drug-topics/opioids/benzodiazepines-opioids

to adequately establish procedures to comply with its statutory duties or deliberate choice to ignore its statutory duty.

78. Avmed reimbursed Defendants for dispensing Opioids to Enrollee J.W.B., and was a victim of Pharmacy Defendants' deceptive and unfair trade practices, individually and collectively, in the dispensing of the relevant controlled substances to Enrollee J.W.B., including the violation of Fla. Admin. Code R. 64B16-27.810, 64B16-27.820, and 64B16-27.831.

79. Every month for three (3) years, Defendants' dispensed prescriptions for both an Opioid and some form of benzodiazepine; in most instances dispensing multiple forms of benzodiazepine and an opioid on the same day.

80. Defendants ignored their statutory duty to provide oversight over the pharmacists and pharmacies in its employ.

81. This individual scenario of Enrollee J.W.B. and Defendants' failure to fulfill its' duties illustrates Defendants' complete systematic failure of its statutory duties.

82. Defendants failed to fulfill its statutory duty to investigate that ultimately would have resulted in a refusal to fill prescriptions, or at the very least confirm the prescription's accuracy with Enrollee J.W.B's prescribing physician.

83. Pursuant to Fla. Admin. Code. R. 64B16-27.831, the standard for filling controlled substances, such as the relevant Opioids, is based on the prescription being issued for a legitimate medical purpose.

84. Defendants dispensed numerous controlled substances to Enrollee J.W.B., including dispensing multiples classes of controlled substances on the same date of service, from the same pharmacy, while Enrollee J.W.B. had been diagnosed as opioid dependent. Defendants

dispensed these prescriptions for a non-legitimate medical purpose, and without satisfying, or at the very least attempting to satisfy, its statutory duty to investigate prescriptions.

85. Defendants' conduct and practices, individually and collectively, are deceptive and unfair practices in the course of trade.

86. Defendants' dispensing of oxycodone hydrochloride (oxycodone tab 30 mg and oxycodone tab HCL 30 mg) and benzodiazepines involves trade or commerce within the meaning of FDUTPA.

87. Defendant's violations of FDUTPA offend Florida's public policy, are immoral, unethical, oppressive and unscrupulous, as well as malicious, wanton and manifesting of ill will, thereby causing substantial injury to Plaintiff's Assignor.

88. But for Defendants' deceptive and unfair conduct, Plaintiff's Assignor, Avmed, would not have incurred the expenses for Opioids and the reasonable medical services to treat Enrollee J.W.B.'s opioid dependency.

89. But for Pharmacy Defendants' failure to comply with its statutory duty to not dispense an controlled substances when numerous red flags are present, Avmed provided opioid dependency healthcare coverage to Enrollee J.W.B. pursuant to its CMS contract between 06/01/2016 and 6/1/2018.

90. At all times material herein, Avmed incurred actual damages as a direct and proximate result of Defendants' individual and collective failure to comply with its State statutory duties, which constitutes a violation of FDUTPA.

91. Pursuant to its' CMS contract, Avmed incurred actual damages of less than thirty-thousand dollars consisting of the amounts paid by Avmed for Enrollee J.W.B.'s opioid prescriptions

and additional reasonable and necessary medical services due to Enrollee J.W.B.'s opioid dependency.

92. In the alternative, Avmed sustained damages calculated by the difference between the prescriptions of the Opioids or opioid dependent prescriptions and the amount of an alternative, non-opioid prescription(s).

93. Subsequent to the actual damages sustained by Avmed, yet prior to the commencement of this Action, Avmed irrevocably assigned the rights of recovery, including Enrollee J.W.B., to Plaintiff (the 'Avmed Assignment').

94. Pursuant to Fla. Stat. § 501.2105, Plaintiff seeks its reasonable attorney's fees and costs in prosecuting this Action.

WHEREFORE, Plaintiff, SERIES 17-03-615, respectfully requests this Honorable Court to enter Judgment against the Pharmacy Defendants for damages, sustained by Plaintiff in relation to Pharmacy Defendants' violations of FDUTPA, including the reasonable attorney's fees and costs in prosecuting this Action, and any other relief this Honorable Court deems just and proper under the circumstances.

## VIII. Demand for Trial by Jury

95. Plaintiff hereby demands a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiff, SERIES 17-03-615, respectfully requests this Honorable Court to enter Judgment against Defendant for damages, sustained by Plaintiff in relation to Defendant's violations of FDUTPA, including the reasonable attorney's fees and costs in prosecuting this Action, and any other relief this Honorable Court deems just and proper under the circumstances.

Date: November 13, 2020

Respectfully submitted,

**MSP RECOVERY LAW FIRM**
*Attorneys for Plaintiff*
2701 S Lejeune Road 10th Floor,
Coral Gables, Florida, 33134
Phone: (305) 614-2222
Serve: serve@msprecoverylawfirm.com

By: */s/ John H. Ruiz*
John H. Ruiz, Fla. Bar. 928150
jruiz@msprecoverylawfirm.com
John W. Cleary, Fla. Bar No. 118137
jcleary@msprecoverylawfirm.com

Ged Lawyers, LLP
*Attorneys for Plaintiff*
7171 North Federal Highway
Boca Raton, FL 33487
Telephone: (561) 995-1966
Facsimile: (561) 241-0812
Serve: service@gedlawyers.com

Michael J. Salviano, Fla. Bar No. 1003920
msalviano@gedlawyers.com

Armas Bertran Zincone
Attorneys for Plaintiff
4960 SW 72 Avenue, Ste. 206
Miami, Florida 33155
Phone: 305-661-2021

Eduardo E. Bertran, FBN: 94087
ebertran@armaslaw.com
Francesco A. Zincone, III, FBN: 100096
fzincone@armaslaw.com

# EXHIBIT 1

**Note from Clinical Development & Education (CD&E)**
**regarding: PER #11018 - American Pain Society:**

Responsibility for preparing/updating clinical practice guidelines relevant to pain has been transferred from the AHCPR to the American Pain Society. The APS had requested industry support, in the form of unrestricted educational grants of $150,000 - $450,000 from corporate APS members to continue the guideline development process.

CD&E, through discussions with members of the APS Board of Directors and Guidelines Committee, conveyed to APS that, while Endo was committed to supporting both the APS and the guideline development process, the grant requested was prohibitively large for a company of our size. CD&E proposed instead, a smaller grant, while at the same time suggesting that we might provide other resources (e.g .ideas and contacts within the primary care community) which would facilitate the dissemination/adoption of the guidelines once they were completed.

The APS Board and Committee accepted this proposal, resulting in the following agreement:

- Endo will commit $25,000 ($10,000 in 1998; $15,000 in 1999) to the guideline development process
- Endo will be recognized as a "founding member" of the APS Guideline Project and will be acknowledged appropriately in all materials developed/distributed by the Committee
- CD&E will sit on the founding members' guideline committee and provide input into topics for guideline development, as well as suggestions of clinicians for participation in the guideline development process, methods of dissemination/adoption, etc.
- As a founding member of the guideline committee, Endo will be entitled to access/distribute copies of the guidelines through CD&E, and if approved by Endo's PMRB, through our sales representatives.

The attached PER represents the 1998 portion of the guideline development/dissemination grant.

# **EXHIBIT 2**

Pain Management Today

VOLUME 1, NUMBER 1 CONTROLLING PAIN, IMPROVING LIVES

INSIDE THIS ISSUE

1 Opioid Analgesics in Nonmalignant Pain *David J. Hewitt, MD*

1 Topical vs Transdermal Medications *Scott Fishman, MD*

3 Mechanisms-based Diagnosis and Treatment of Pain *Misha-Miroslav Backonja, MD*

National Initiative on Pain Control Dinner Dialogue Series List *on page 7*



FACULTY ADVISOR
**Charles E. Argoff, MD**
*Assistant Professor of Neurology*
*New York University School of Medicine*

THOMSON
PROFESSIONAL POSTGRADUATE SERVICES

© Professional Postgraduate Services® a division of Physicians World/Thomson Healthcare, 2001. All rights reserved. Secaucus, NJ.

Supported by an unrestricted educational grant from Endo Pharmaceuticals Inc.

NATIONAL INITIATIVE ON PAIN CONTROL

# Opioid Analgesics in Nonmalignant Pain

**DAVID J. HEWITT, MD**
*Emory University*
*Clinical investigator for Pfizer Inc., Abbott Laboratories, and Knoll Pharmaceutical Company and a member of the speakers bureau of Endo Pharmaceuticals Inc.*

***... pain is not well-managed and the JCAHO's concerns are well-founded.***

THE CURRENT popularity of OxyContin® (oxycodone) as a drug of abuse has led to concerns that opioid analgesics are prescribed too frequently. Yet, juxtaposed against this growing concern are the new rules of the Joint Commission on Accreditation of Healthcare Organizations (JCAHO) that address the significant undertreatment of pain.[1]

These guidelines, which elevate pain to a fifth vital sign, recognize that the undertreatment of pain is a significant problem that requires regulatory oversight. When one considers that 50% of patients dying with cancer still suffer moderate-to-severe pain,[2] it is clear that pain is not managed well and that the JCAHO's concerns are well-founded. Ironically, the fear of regulatory oversight led to the undertreatment of pain. Physicians are worried that prescribing opioid analgesics will put them at risk of being investigated by the Drug Enforcement Agency (DEA) or their state medical board.[3-5] Importantly, both the DEA and state medical boards recognize that opioid analgesic therapy can be used appropriately in patients with nonmalignant pain.

In addition to regulatory concerns, a number of other barriers prevent the appropriate management of pain. Education is first among these: little time is spent during medical school or residency training programs studying the assessment and treatment of chronic pain syndromes; still less time is allocated to the appropriate use of opioid analgesics. In a society that is very concerned about addiction, very little time has been given to

*Continued on page 4*

# *Topical vs Transdermal Medications*

**SCOTT FISHMAN, MD**
*University of California, Davis Medical Center*
*Dr Fishman has reported no significant financial interests or affiliations. He is a member of the speakers bureau of Endo Pharmaceuticals Inc.*

Recently several drugs have become available in the form of patches that can be absorbed into or through the skin. Other similar agents that can be used in topical application are creams, ointments, gels, or lotions. Each of these drugs will have different effects depending on the absorption dynamics of the product.

Thus, the terms topical and transdermal, which are not necessarily new terminology, reflect potentially significant differences.

Two skin patch formulations well illustrate the differences between topical and transdermal delivery: the Duragesic® patch offers transdermal delivery of fentanyl,[1] whereas the Lidoderm® patch offers topical delivery of lidocaine. Each is an adhesive patch applied to the skin.[2]

The critical difference is that the transdermal product (fentanyl) delivers clinically relevant amounts of the drug into the systemic circulation. The topical product (lidocaine patch 5%) delivers clinically relevant doses into the tissue directly below the patch and, at suggested dosages, may have no systemic effects.[2,3] In the case of transdermal fentanyl, the tissue under the patch serves as an entry port

*Continued on page 8*

Pain Management Today
CONTROLLING PAIN, IMPROVING LIVES
VOLUME 1, NUMBER 1

NATIONAL INITIATIVE ON PAIN CONTROL

EDUCATION COUNCIL

CO-CHAIRMEN

**Robert H. Dworkin, PhD**
Professor of Anesthesiology, Oncology, and Psychiatry
Department of Anesthesiology
University of Rochester Medical Center

**Nathaniel P. Katz, MD**
Assistant Professor, Anesthesia
Pain Management Center
Brigham & Women's Hospital

COUNCIL MEMBERS

**Charles E. Argoff, MD**
Director, Cohn Pain Management Center
North Shore University Hospital
Assistant Professor of Neurology
New York University School of Medicine

**Misha-Miroslav Backonja, MD**
Associate Professor
Department of Neurology
University of Wisconsin Hospital & Clinics

**Daniel A. Brzusek, DO**
Medical Director, Northwest Rehabilitation Associates, Inc.
Clinical Assistant Professor
Department of Rehabilitation Medicine
University of Washington

**Scott Fishman, MD**
Chief, Division Pain Medicine
Department of Anesthesia & Pain Medicine
University of California, Davis Medical Center

**David J. Hewitt, MD**
Assistant Professor of Neurology
Emory University

**Allan M. Levy, MD**
Team Physician, New York Football Giants

**Christine Miaskowski, PhD, RN, FAAN**
Professor and Chair
Department of Physiological Nursing
University of California, San Francisco

**Michael H. Moskowitz, MD, MPH**
Bay Area Pain Medical Associates
Mill Valley, California

**Bruce D. Nicholson, MD**
Clinical Associate Professor Anesthesia
Penn State School of Medicine
Director, Pain Management/Hospice
Lehigh Valley Hospital and Health Network

**David M. Simpson, MD**
Director, Clinical Neurophysiology Laboratories
Department of Neurology
Mount Sinai Hospital

**Dennis C. Turk, PhD**
John and Emma Bonica Professor of Anesthesiology & Pain Research
Department of Anesthesiology
University of Washington

THOMSON
PROFESSIONAL POSTGRADUATE SERVICES

© Professional Postgraduate Services® a division of Physicians World/Thomson Healthcare, 2001. All rights reserved. Secaucus, NJ.

Supported by an unrestricted educational grant from Endo Pharmaceuticals Inc.

# LETTER FROM THE CO-CHAIRMEN

Dear Colleague,



Dr. Katz



Dr. Dworkin

The inaugural issue of *Pain Management Today*, the Newsletter Series of the National Initiative on Pain Control™ (NIPC™), is one component of the NIPC's educational programs for physicians who treat patients with pain.

This publication was designed to be clinically useful in your day-to-day practice by providing the latest information on novel approaches to assessing and managing pain. The articles, written by the distinguished members of the NIPC's education council and faculty, are timely and relevant in addressing treatment issues such as the controversial use of opioids in noncancer pain, the differences between transdermal and topical medications, and the mechanisms of neuropathic and nociceptive pain.

As described in its mission, the NIPC is dedicated to heightening the knowledge of physicians and other healthcare providers about the serious impact of unresolved pain on patient care. We believe that we can further this goal by increasing clinicians' understanding of the nature and treatment of pain, as well as the impact of chronic pain on their patients' health and psychological well-being. The goals of the NIPC are listed below this letter.

In summary, physicians can make a difference in their patients' quality-of-life. We hope you find our educational newsletter to be a valuable aid in your practice.

On behalf of all the NIPC members, we would like to express my appreciation to Endo Pharmaceuticals Inc. for providing the unrestricted educational grant that made this publication a reality.

Sincerely,

| | |
|---|---|
| **Nathaniel P. Katz, MD** | **Robert H. Dworkin, PhD** |
| *NIPC Co-chairman* | *NIPC Co-chairman* |

## PROGRAM GOALS

- Elevate the importance of managing the patient with pain, by heightening physician and healthcare provider awareness of the impact of pain on the patient's daily living in terms of quality of life, lost workdays, and societal/familial consequences.
- Expand physicians' basic understanding of pain etiology, to empower physicians to differentiate types of pain, resulting in improved precision in diagnosis and therapeutic decisions.
- Provide physicians with the latest advances and strategies in pain management (medications, delivery systems, compounding, and mechanisms of action), and translate clinical data into clinical practice utility.
- Emphasize importance of tolerability, safety, and nontoxicity in selecting effective pain therapies. Address cost-effective issues.
- Address barriers to achieving pain control and common misconceptions about the use of pain therapies.
- Provide physicians with patient education tools that improve the channels of communication between the physician/healthcare provider and patient.

# Mechanisms-based Diagnosis and Treatment of Pain

**MISHA-MIROSLAV BACKONJA, MD**
*University of Wisconsin Hospital and Clinics*
*Clinical investigator for Abbott Laboratories, Elan Pharmaceuticals, and Pfizer Inc. and a member of the speakers bureau of Endo Pharmaceuticals Inc.*

Pain is a complex clinical phenomenon. In most circumstances, pain is a symptom when it happens acutely, but a disease when it presents chronically.

Chronic pain affects the entire body in the same way as conditions such as diabetes and hypertension. The chronic pain affects the whole person. In this sense, chronic pain is attention-grabbing: patients constantly know they are in pain. To diagnose chronic pain, the whole patient must be considered, which can make a difference in how to treat the patient.

In the most general terms, the mechanisms-based diagnostic process starts with establishing the etiology and evaluating the patient for evidence of the mechanism of pain. The next step is assessing the psychological impact of pain on a patient's well-being and overall function.

From a pathophysiological prospective of pain diagnosis, a high degree of certainty is clinically possible when distinguishing between the two major categories of pain: inflammatory pain and neuropathic pain. The figure (upper right) summarizes the differences between inflammatory and neuropathic pain and lists examples of each type of pain. Important diagnostic and therapeutic clinical implications can be drawn from this mechanisms-based distinction. Taking a patient history and conducting a physical examination will show abnormal neurological results in patients with neuropathic pain; however, the results of a neurological examination are normal in cases of inflammatory pain (except for symptoms of hypersensitivity specifically in the area of pain). The therapeutic implication is that inflammatory pain disorders readily respond to opioids, but painful neuropathic disorders are better controlled by adjuvant analgesics, otherwise considered neuromodulators.[1]

The basic science of the pathophysiological mechanisms underlying neuropathic pain were only recently described after the development of animal models of pain. These processes can be characterized as peripheral sensitization and central sensitization depending where on the neuraxis the abnormal physiological and biochemical processes occur.[2]




### Abnormalities of Neuropathic Pain

Inflammatory and neuropathic pain share some similarities, such as the release of inflammatory substances in the peripheral nervous system and the activation of N-methyl D-aspartate (NMDA) receptors in the central nervous system. The figure (below) illustrates the similarities. However, major abnormalities related to nerve damage and incomplete repair of the nervous system occur with neuropathic pain. For example, damaged nerves are characterized by:

- The formation of neuromas, which are mechanosensitive and chemosensitive
- Ectopic discharges of irritated nociceptors
- Crosstalk or ephaptic transmission between injured and regenerating neurons.




Courtesy of R. Gallagher, MD, adapted from Seltzer Z, Devor M. *Neurology*. 1979;29:1061-1064.

In addition, large fibers, which evoke innocuous sensations such as a tickle when activated under normal circumstances, undergo a phenotypic switch during neuropathic pain and thereby behave like pain fibers and evoke pain. Damage to nerve fibers and pain result in loss of inhibitory interneurons and a loss of inhibition of pain.[2] This loss is one reason why much larger doses of opioids are needed to control neuropathic pain.

Knowing this makes it much easier to understand why patients with neuropathic pain with numbness can simultaneously experience hyperalgesia. We now have more specific treatments and the means for developing them beyond the traditional analgesics.

Physicians can assess patients with neuropathic pain according to standard pain assessment tools such as the Short-Form McGill[3] and Brief Pain questionnaire.[4] In addition, clinicians can use more specific pain questionnaires such as the Neuropathic Pain Scale[5] or LANSS despite their limitations.[6] But fundamental to any pain assessment is taking seriously the patient's pain report. Positive response to a medication with a specific mode of action can further support the postulated mechanism underlying the chronic pain.

With the improvement in the assessment of pain and more specific diagnosis, we will be able to provide our patients with a higher degree of pain relief.

### References

1. Backonja MM, Galer BS. Pain assessment and evaluation of patients who have neuropathic pain. *Neurol Clin*. 1998;16:775-790.
2. Woolf CJ, Salter MW. Neuronal plasticity: increasing the gain in pain. *Science*. 2000;288:1765-1769.
3. Melzack R. The short-form McGill Pain Questionnaire. *Pain*. 1987;30:191-197.
4. Daut RL, Cleeland CS, Flanery RC. Development of the Wisconsin Brief Pain Questionnaire to assess pain in cancer and other diseases. *Pain*. 1983;17:197-210.
5. Galer BS, Jensen MP. Development and preliminary validation of a pain measure specific to neuropathic pain: the Neuropathic Pain Scale. *Neurology*. 1997;48:332-338.
6. Bennett M. The LANSS Pain Scale: the Leeds assessment of neuropathic signs and symptoms. *Pain*. 2001;92:147-157.

# Opioid Analgesics in Nonmalignant Pain

*Continued from page 1*

the assessment and appropriate management of addiction disorders.[4,6-14] As the JCAHO guidelines take effect, medical schools and residency training programs will be forced to allocate more time to addiction and pain management.

Consequently, it is important to understand some key terms when prescribing opioid analgesics. These terms include addiction, physical dependence, tolerance, and pseudoaddiction. They are defined in the sidebar at the bottom of this page.

Good pain management, like good medical care in general, must be discernable in the medical record. Documenting the physician's thinking in a very clear and readable fashion is important in prescribing opioid medications. Documentation includes the pain history, pain assessment, and physical examination. The pain should be characterized by its qualities (eg, sharp, shooting, lancinating, burning, tingling) in order to discern a presumed pain pathophysiology (ie, nociceptive or neuropathic) and pain etiology. Diagnostic tests should be reviewed and discussed, as must a differential diagnosis, how the ultimate diagnosis was determined and whether the disorder is curable. Previous treatment modalities, including primary treatments, should be reviewed. The prior medical record must also be reviewed and the patient's history and treatment should be discussed with their previous physicians.

### The Underutilized Resource

Pharmacists are often an underutilized resource for managing chronic pain. They are often the first healthcare provider to know when a patient may be misusing a medication. So checking with a patient's pharmacy about concerns over aberrant drug use, especially obtaining the same or similar drugs from more than one physician, is a reasonable procedure.[5]

It is also important to determine if the individual is at a high or low risk for addiction.[15-16] One must ask about a personal or family history of alcohol or drug abuse. The medical record should reveal that a discussion of opioid side effects, including the risk of addiction, has occurred.

Part of the decision to use opioid analgesics is demonstrating in the medical record that other modalities were employed and failed to control the pain and that medical evidence exists that the pain syndrome is likely to be opioid responsive. The other modalities should include adjuvant and nonopioid analgesics as well as attempts at primary therapy. Further, the management of chronic pain requires an interdisciplinary approach that includes physical therapy and behavioral and cognitive therapies. Lifestyle changes and education should also be an important part of pain management.

Some pain specialists believe that a written agreement is helpful in making sure that the patient is compliant with medications. These agreements specify rules for treatment and discuss the consequences of aberrant behaviors. Other physicians do not support the use of these agreements. In either case, it is important to make clear to patients and their families that opioid analgesics are controlled substances that should be taken carefully according to specific rules. These rules include:

- The patient will not call in early for prescriptions and not call after the prescribing physician's office hours.
- Patients can receive prescriptions for their analgesic medication from only one physician and get them filled at only one pharmacy.
- Patients should not increase the medication without prior approval from the prescribing physician.
- The medication should only be used for the purposes of pain control.
- The medication cannot be sold or shared.

If the rules are broken the opioid analgesic should be stopped. Patients are then required to make weekly visits to their physician to have a urine toxicology screen, the opioid may be prescribed on a weekly basis, and treatment by an addiction specialist may be necessary.

### Dosing Opioid Analgesics

Opioids are indicated for moderate-to-severe pain. Once the decision has been made to start an opioid analgesic, patients should initially be given a low dose. Starting with a low dose and increasing the dose slowly can prevent adverse effects. The dose should be given around-the-clock with extra medication available for breakthrough pain. The dose is increased slowly until analgesia is achieved or dose-limiting side effects occur. Side effects can be treated (eg, nausea with an antiemetic), or the patient can be switched to another

## KEY TERMS FOR OPIOID ANALGESICS

**Addiction** for the purposes of pain management is often defined as using a drug despite the harm it is causing to one's life, use of a drug for other than its intended medical purposes, and loss of control over taking the drug. An important characteristic of addiction is that an alteration occurs in the function of the central nervous system which some individuals find desirable. This change leads to behaviors to obtain the drug and cravings for the drug.

**Physical dependence** means that suddenly stopping an opioid or reversing an opioid agonist by administering an opioid antagonist will precipitate an abstinence syndrome. Neither physical dependence nor tolerance should be equated with addiction, although both can be part of addiction.

**Tolerance** means that the dose of a drug needs to be increased to achieve the same effect that was previously obtained at a lower effective dose. Tolerance develops to the changes in central nervous system (CNS) function that drug addicts seek (eg, getting "high"), and the patient now requires increasingly higher doses. But tolerance does not seem to develop as quickly to the analgesic effect of these medications.

**Pseudoaddiction** refers to behaviors that might seem aberrant, but actually indicate inadequate treatment of pain. The behaviors resolve when the pain medication is increased and appropriate analgesia is obtained.[1-6]

1. Aronoff GM. Opioids in chronic pain management: is there a significant risk of addiction? *Curr Rev Pain*. 2000;4:112-121.
2. Savage SR. Opioid therapy of chronic pain: assessment of consequences. *Acta Anaesthesiol Scand*. 1999;43:909-917.
3. Schug SA, Merry AF, Acland RH. Treatment principles for the use of opioids in pain of nonmalignant origin. *Drugs*. 1991;42:228-239.
4. Sorge J. The lesson from cancer pain. *Eur Jour Pain*. 2000;4(suppl A):3-7.
5. Zenz M. Morphine myths: sedation, tolerance, addiction. *Postgrad Med J*. 1991;67(suppl 2):S100-S102.
6. Weissman DE, Haddox JD. Opioid pseudoaddiction—an iatrogenic syndrome. *Pain*. 1989;36:363-366.

opioid analgesic. When switching from one opioid to another, it is important to calculate the equianalgesic dose and then cut back by 50% for most opioids and by 75% for methadone.[17-22] The goal is to have around-the-clock dosing with a long-acting opioid supplemented by a short-acting opioid for breakthrough pain.

After opioid analgesic therapy has been initiated, follow-up visits should also be well documented in the medical record.[23] One simple method is called the four A's, which stand for analgesia, adverse events, activity level, and addiction. Pain intensity is one method of assessing analgesia. The intensity of pain can be determined by having the patient state on a zero (no pain) to 10 (worse pain imaginable) scale how bad their pain is at the moment, the worse it has been during the week, the least it has been, and how much pain the patient has had on average. Another measure of analgesia is pain relief that can be indicated on a 0% (no pain relief) to 100% (complete pain relief) scale. Pain control can also be a good measure of analgesia. For example, is the pain under excellent, good, fair, poor, or no control. Because analgesia always exists in a balance with side effects, it is also very important to ask the patient whether they would like better pain control and whether the pain medication needs to be adjusted.

The second A is for adverse effects or side effects. Opioid analgesics have a number of troubling side effects, so it is important to ask the patient about these.

The third A is for activity level, which is a good measure of the success of pain management. It is important to ask whether activity level has increased, decreased, or stayed the same.

The last A is for addiction, which can be assessed by the physician's experience of the patient's care. Has the patient followed the rules well or do they consistently test the limits? It is reasonable to ask patients if they are addicted to the medication, if they are using it for any other purpose than pain control, whether they find themselves taking rescue doses even when they are not in pain, and whether they are sharing or selling the medication.

### Involve the Family

Finally, for assessing the success of pain management and for evidence of aberrant drug use, it is reasonable to have the patient bring a family member, spouse, or friend to an office visit. Individuals often have people who care about them and are willing to confirm the patient's experience or challenge the patient's report. For example, a family member may report that the patient really is not taking the medication as directed and is undermedicating for any reason, including intolerable side effects. Or a husband might state that he is concerned that his wife sleeps all the time. Sometimes these people wrongly assume that any use of an opioid analgesic means that the patient is addicted. Educating the patient's support system can be very helpful in improving compliance and limiting stress.

***It is reasonable to ask patients if they are addicted to the medication, if they are using it for any other purpose than pain control, whether they find themselves taking rescue doses even when they are not in pain, and whether they are sharing or selling the medication.***

The following question is central to pain management: how can one safely prescribe strong analgesics to patients who could benefit from these agents and also satisfy a cardinal moral and ethical imperative to relieve suffering while not being duped by individuals seeking these medications for aberrant purposes? The answer is to develop good practice habits and make sure that these habits are reflected in the medical record.

### References


1. Joint Commission on Accreditation of Healthcare Organizations. Available at: http://jcprdw1.jcaho.org/trkhco_frm.html. Accessed September 2001.

2. Von Roenn, JH, Cleeland CS, Gonin, R, et al. Physician attitudes and practice in cancer pain management. A survey from the Eastern Cooperative Oncology Group. *Ann Intern Med.* 1993;119:121-126.

3. Hill CS. Relationship among cultural, educational, and regulatory agency influences on optimum cancer pain treatment. *J Pain Symptom Manage.* 1990;5(suppl 1):S37-S45.

4. Gilson AM, Joranson DE. Controlled substances and pain management: changes in knowledge and attitudes of state medical regulators. *J Pain Symptom Manage.* 2001;21:227-237.

5. Clark HW. Policy and medical-legal issues in the prescribing of controlled substances. *J Psychoactive Drugs.* 1991;23:321-328.

6. Bressler LR, Geraci MC, Schatz BS. Misperceptions and inadequate pain management in cancer patients. *DICP.* 1991;25:1225-1230.

7. Breitbart W, Passik S, McDonald MV, et al. Patient-related barriers to pain management in ambulatory AIDS patients. *Pain.* 1998;76:9-16.

8. Clarke EB, French B, Bilodeau MK, et al. Pain management knowledge, attitudes and clinical practice: the impact of nurses' characteristics and education. *J Pain Symptom Manage.* 1996;11:18-31.

9. Ferrell BR, McCaffery M, Rhiner M. Pain and addiction: an urgent need for change in nursing education. *J Pain Symptom Manage.* 1992;7:117-124.

10. Galer BS, Keran C, Frisinger M. Pain medicine education among American neurologists: a need for improvement. *Neurology.* 1999;52:1710-1712.

11. McCaffery M, Ferrell BR. Opioid analgesics: nurses' knowledge of doses and psychological dependence. *J Nurs Staff Dev.* 1992;8:77-84.

12. McCaffery M, Ferrell BR. Opioids and pain management: what do nurses know? *Nursing.* 1999;29:48-52.

13. Sloan PA, Deanelly MB, Schwartz RW, Sloan DA, et al. Cancer pain assessment and management by housestaff. *Pain.* 1996;67:475-481.

14. Turk DC, Brody MC, Okifuji EA. Physicians' attitudes and practices regarding the long-term prescribing of opioids for non-cancer pain. *Pain.* 1994;59:201-208.

15. Savage SR. Long-term opioid therapy: assessment of consequences and risks. *J Pain Symptom Manage.* 1996;11:274-286.

16. Radbruch L, Grond S, Lehmann KA. A risk-benefit assessment of tramadol in the management of pain. *Drug Saf.* 1996;15:8-29.

17. Lawlor P, Turner K, Hanson J, et al. Dose ratio between morphine and hydromorphone in patients with cancer pain: a retrospective study. *Pain.* 1997;72:79-85.

18. Morley JS. Opioid rotation: does it have a role [letter; comment]? *Palliat Med.* 1998;12:464-466.

19. Daeninck PJ, Bruera E. Reduction in constipation and laxative requirements following opioid rotation to methadone: a report of four cases. *J Pain Symptom Manage.* 1999;18:303-309.

20. Thomsen AB, Becker N, Eriksen J. Opioid rotation in chronic non-malignant pain patients. A retrospective study. *Acta Anaesthesiol Scand.* 1999;43:918-923.

21. Mancini I, Lossignol DA, Body JJ. Opioid switch to oral methadone in cancer pain. *Curr Opin Oncol.* 2000;12:308-313.

22. Cherny N, Ripamonti C, Pereira J, et al. Strategies to manage the adverse effects of oral morphine: an evidence-based report. *J Clin Oncol.* 2001;19:2542-2554.

23. Passik SD, Portenoy RK, Ricketts PL. Substance abuse issues in cancer patients. Part 2: Evaluation and treatment. *Oncology (Huntingt).* 1998;12:729-734; discussion 736.

# REVIEW OF RECENT MEDICAL LITERATURE: Developments in Managing Chronic Pain

**This summary of recently published articles in peer-reviewed medical journals focuses on information that could affect the practices of physicians who treat patients with chronic pain. These articles discuss the treatment, diagnosis, and assessment of several types of chronic pain. The topics reviewed in these articles include the use of long-term opioids for chronic pain, other options in chronic pain therapy, the diagnosis of diabetic neuropathy, and pain-management scales.**

**Physicians who are interested in these subjects are advised to consult the full articles. Inclusion of an article in this summary should not be construed as a recommendation by the National Initiative on Pain Control™.**

## Treatment of Chronic Pain

Recent articles reviewed the use of long-acting opioids for chronic pain and advances in treating neuropathic pain.

**McCarberg BH, Barkin RL. Long-acting opioids for chronic pain: pharmacotherapeutic opportunities to enhance compliance, quality of life, and analgesia. *Am J Ther.* 2001;8:181-186.**

The authors discuss the treatment of chronic pain with opioid agonists, which they describe as controversial even though these agents are considered to be "among the most effective analgesics available for reducing pain perception." The article states that, "Short-acting opioids provide effective analgesia for acute pain but should be avoided as primary analgesics for chronic pain management. Long-acting opioids have greater utility than short-acting opioids in treating chronic pain in patients with consistent pain levels. Results of studies show that improved quality of life is directly related to the use of long-acting opioids in patients with chronic pain of both cancer and noncancer etiology."

**Carter GT, Galer BS. Advances in the management of neuropathic pain. *Phys Med Rehabil Clin N Am.* 2001;12:447-459.**

The authors reviewed the research, patient assessment, and treatment progress achieved during the past 5 years for neuropathic pain. They focused on the use of new treatments, especially the anticonvulsant gabapentin and the topical lidocaine patch 5%, for neuropathic pain. They conclude that, "The available clinical trial data indicate that newer antiepileptic drugs, most notably gabapentin, are better alternatives to older medications such as carbamazepine or phenytoin in the treatment of neuropathic pain."

In addition, the authors contend that, "With the advent of the topical lidocaine patch, the first drug with an FDA-approved indication for postherpetic neuralgia, a revolutionary new agent is now available for the treatment of neuropathic pain that does not have any systemic side effects."

Two nonpharmaceutical methods for treating chronic pain are implanted, continuous flow infusion pumps and spinal cord stimulation with electricity or a pulse generator. The successful use of both methods has been discussed in a number of articles. A summary of one article on spinal cord stimulation follows.

**Kemler MA, Barendse GA, van Kleef M, et al. Spinal cord stimulation in patients with chronic reflex sympathetic dystrophy. *N Engl J Med.* 2000;343:654-656**

The authors conducted a randomized trial in 36 patients who received either spinal cord stimulation or physical therapy for complex regional pain syndrome, which is a painful, disabling disorder that does not have a proven treatment. Stimulation was successful in 24 patients, and a statistically significant number of the patients were much improved ($P=0.01$). The authors concluded that "electrical stimulation of the spinal cord can reduce pain and improve the health-related quality of life."

## Diagnosing Neuropathic Pain

Several diagnostic tests and procedures have recently been evaluated in the clinical literature. One evaluation attempted to develop recommendations for screening tests for diabetic neuropathy.

**Perkins BA, Olaleye D, Zinman B, Bril V. Simple screening tests for peripheral neuropathy in the diabetes clinic. *Diabetes Care.* 2001;24:250-256.**

According to the authors, clinical practice guidelines lack the clinical evidence to recommend screening tests for diabetic neuropathy. The authors, therefore, sought to evaluate four "rapid and reliable sensory tests" that would be "appropriate for the diagnosis of neuropathy in the diabetes clinic." The four tests are the 10-g Semmes-Weinstein monofilament examination (SWME), superficial pain sensation, vibration testing by the on-off method, and vibration testing by the timed method. The tests were independent blinded evaluations and were administered to 478 subjects and compared with the standard of nerve conduction studies. Based on the results of their evaluation, the authors concluded that, "Annual screening for diabetic neuropathy should be conducted using superficial pain sensation testing, SWME, or vibration testing by the on-off method."

## Pain Assessment Scales

Pain scales that assess the extent and degree of patients' pain have become a tool of patient management. The current standard scale for neuropathic pain is the Neuropathic Pain Scale (Galer BS, Jensen MP. *Neurology.* 1997;48:332-338). The scale relies on patients' descriptions of their pain. The descriptions include "intense," "sharp," "itchy," and "deep." A new scale that was evaluated recently in a clinical trial is the Amsterdam Pain Management Index. Another clinical study compared the effectiveness of diagnosing pain by asking patients about their pain or using pain scales.

**de Wit R, van Dam F, Loonstra S, et al. The Amsterdam Pain Management Index compared to eight frequently used outcome measures to evaluate the adequacy of pain treatment in cancer patients with chronic pain. *Pain.* 2001;91:339-349.**

The recently developed Amsterdam Pain Management Index evaluates the effectiveness of cancer pain treatment by comparing patients' present pain intensity, average pain intensity, and worst pain intensity with a composite score of analgesics used. The index then corrects for what a patient considers as a tolerable level of pain.

This trial compared the Amsterdam index with eight frequently used outcome measures. The randomized controlled trial involved 313 cancer patients with pain for at least 1 month and questioned the patients three times during the 2 months after their hospital discharge. The researchers concluded, "The test of known-groups comparisons and equivalence between groups indicated that the Amsterdam Pain Management Index showed promising results."

**Kamel HK, Phlavan M, Malekgoudarzi B, et al. Utilizing pain assessment scales increases the frequency of diagnosing pain among elderly nursing home residents. *J Pain Symptom Manage.* 2001;21:450-455.**

The researchers studied the effectiveness of two types of pain assessment: asking residents of nursing homes, "Do you have pain?" or assessing pain according to three pain scales: the visual analog scale, the behavior (faces) scale, and the pain descriptive scale. A total of 305 residents in skilled nursing facilities in New York and Missouri participated in the study.

A significantly greater number of patients were diagnosed with pain in the group evaluated by the pain scales ($P<0.01$) than among patients who were asked if they had pain.

# Topical vs Transdermal Medications

*Continued from page 1*

into the body allowing fentanyl to pass through the dermis and into subcutaneous tissues. Fentanyl's lipophilic nature allows it to be selectively absorbed into subcutaneous fat, which then serves as a conduit for slow release into the general circulation. The area to which the patch is applied does not need to be the same as the targets that the drug seeks to affect.[1]

In contrast, topical delivery systems such as the lidocaine patch 5% are geographically targeted so that the area of application on the skin directly corresponds to the tissue needing treatment. The drug is formulated to allow lidocaine to penetrate through the epidermis and into the dermis with minimal further passage into the subcutaneous tissues. Therefore, the systemic absorption of lidocaine patch 5% is approximately 1% to 5% of the dose. With the use of three or fewer patches for no more than 12 hours per day, systemic levels have been found to be minimal, even after repeated applications and maximum daily dosing.[2]

## Topical vs Transdermal: Opposite Profiles

In summary, the topical application can offer concentrated effects on a local area related to the skin without clinically relevant systemic effects, whereas transdermal delivery can offer the opposite profile of relevant systemic levels without significant local effects. The table summarizes the differences between the two types of delivery systems.[2,3]

Although the analgesic products Duragesic® and Lidoderm® exemplify the differences between topical and transdermal drug delivery, other agents are currently being used for similar purposes. Clonidine, which is available as a topical patch, offers transdermal delivery but also may have topical effects. Thus, patients using the patch* for pain relief may place it on the skin near the area of pain, whereas patients using it for hypertension may place it anywhere.[4,5] Capsaicin cream, a derivative of chili peppers that can deplete substance P from nerve terminals in the skin, can be an effective topical analgesic agent. However, application can be problematic for some patients because of capsaicin's initial burning effects on certain affected skin or other tissues.[6] There is also a trend in pain medicine towards compounding special combinations of analgesic agents in creams, lotions, or gels that can be applied to the skin near symptoms. Compounded preparations have included almost any combination of drugs, including nonsteroidal anti inflammatory drugs, amitriptyline, gabapentin, ketamine, clonidine*, and many others.[5,7-9] Anecdotal reports suggest efficacy; however, the systemic absorption of these drugs may be possible and is potentially difficult to quantify and modulate. Nonetheless, compounded preparations represent an important area of drug delivery.

Topical and transdermal drug delivery systems can be effective routes of drug administration. Understanding the different and sometimes overlapping properties of these systems will help clinicians maintain efficacy and safety.

### Topical vs Transdermal Drug Delivery Systems

| Characteristic | Topical (eg, lidocaine patch 5%) | Transdermal (eg, fentanyl patch) |
|---|---|---|
| Site of activity | Peripheral tissue | Systemic |
| Placement | Directly over painful site | Arbitrary |
| Serum level | Insignificant | Necessary |
| Systemic side effects | Unlikely | Possible |

Galer BS, Dworkin RH. *A Clinical Guide to Neuropathic Pain.* Minneapolis, Minn: The McGraw-Hill Companies; 2000.

## References

1. *Physicians Desk Reference.* Montvale, NJ: Medical Economics, Inc. 2001:1573-1577.

2. *Physicians Desk Reference.* Montvale, NJ: Medical Economics, Inc. 2001:1204-1205.

3. Galer BS, Dworkin RH. A Clinical Guide to Neuropathic Pain. Minneapolis, Minn: The McGraw-Hill Companies. 2000; 57,62.

4. *Physicians Desk Reference.* Montvale, NJ: Medical Economics, Inc. 2001: 968-971.

5. Byas-Smith MG, Max MB, Muir J, Kingman A. Transdermal clonidine compared to placebo in painful diabetic neuropathy using a two-stage "enriched enrollment" design. *Pain.* 1995;60:267-274.

6. Low PA, Opfer-Gehrking TL, Dyck PJ, et al. Double-blind, placebo-controlled study of the application of capsaicin cream in chronic distal painful polyneuropathy. *Pain.* 1995;62:163-168.

7. King RB. Topical aspirin in chloroform and the relief of pain due to herpes zoster and postherpetic neuralgia. *Arch Neurol.* 1993;50:1046-1053.

8. Azevedo VM, Lauretti GR, Pereira NL, Reis MP. Transdermal ketamine as an adjuvant for postoperative analgesia after abdominal gynecological surgery using lidocaine epidural blockade. *Anesth Analg.* 2000;91:1479-1482.

9. Scott MA, Letrent KJ, Hager KL, Burch JL. Use of transdermal amitriptyline gel in a patient with chronic pain and depression. *Pharmacotherapy.* 1999;19:236-239.

*Not approved by FDA for this use.

Pain Management Today

THOMSON
PROFESSIONAL POSTGRADUATE SERVICES

Professional Postgraduate Services®, a division of Physicians World/Thomson Healthcare
400 Plaza Drive, Secaucus, NJ 07094

# EXHIBIT 3

ENDO PHARMACEUTICALS

**Toll Free: 800-462-3636**
**Web: www.endo.com**

**This brochure was developed by Margo McCaffery, RN, MS, FAAN, and Chris Pasero, RN, MS, FAAN authors of *Pain: Clinical Manual* (2nd ed. Mosby; 1999). Edited by Russell K. Portenoy, MD.**

©2004 Endo Pharmaceuticals PM-0120





# Understanding Your Pain





## *Taking Oral Opioid Analgesics*



**The information contained in this brochure does not take the place of talking with your healthcare provider about your pain and your pain medications.**

# Taking Oral Opioid Analgesics

## What are opioid analgesics?

Opioid (oh'-pea-oyd) analgesics used to be called narcotics, but today the correct term for these pain medicines is opioids. Opioids are one type of pain medicine; another type is nonopioids which includes medicines like acetaminophen (such as Tylenol® tablets, caplets, or gelcaps) and ibuprofen (such as Motrin® IB tablets, caplets, or gelcaps). Nonopioids are generally used to treat mild pain, whereas opioid analgesics are used to treat moderate to severe pain.

Like all medicines, only the person who is prescribed opioids should take them. They should be kept in a safe place where children and others cannot reach them.

Opioids may be given by mouth, by injection into the muscle, vein, or spine, or by other methods. The most common and convenient way to take opioids is by mouth (known as oral opioids). Most oral opioids are available as pills; some are available as liquids. In this brochure, we will discuss the pills.



## How long does pain relief from an oral opioid last?

Opioids may be short-acting or long-acting.

Short-acting opioids are sometimes called immediate release. These opioids usually have an effect within an hour and relieve pain for about 4 hours.

- Short-acting opioids are usually taken when pain lasts only a few days.
- Examples of oral short-acting opioids:

  codeine
  (as in Tylenol #3® tablets)
  hydrocodone
  (as in Zydone® tablets or Vicodin® tablets)
  hydromorphone
  (such as Dilaudid® tablets)
  morphine
  (such as MSIR® tablets or capsules)
  oxycodone
  (as in Percocet® tablets, Tylox® capsules, or Roxicodone® tablets or oral solution)
  propoxyphene
  (as in Darvon® capsules or Darvocet-N® tablets)
- Some short-acting opioid medicines contain the opioid alone while others contain a combination of an opioid and a nonopioid, often acetaminophen (such as Tylenol® tablets, caplets or gelcaps). For example, oxycodone may be given alone (such as Roxicodone® tablets or oral solution) or in combination with acetaminophen as in Percocet® tablets.

- When an opioid is combined with acetaminophen, the total dose of acetaminophen taken in one day should not be more than 4000 mg. Higher doses could damage your liver. People who have liver disease or drink alcohol heavily should take even less acetaminophen. Be aware of how much acetaminophen is in your medicine, both prescribed medicine and medicine you get without a prescription, such as cold remedies.

Long-acting forms of opioids are sometimes called controlled-release or extended-release. This means the medicine is gradually released into the body over an 8 to 12 hour period or longer.

- Long-acting opioids are usually used for chronic pain that lasts most of the day. They are taken at regularly scheduled times, such as every 12 hours. In addition, a short-acting pain medicine is usually prescribed at the same time, with instruction to take a dose as needed should the pain temporarily increase.
- Examples of oral long-acting opioids:

  morphine
  (such as Oramorph® tablets, MS Contin® tablets, or Avinza® capsules)
  oxycodone
  (such as OxyContin® tablets)



## What should I know about opioids and addiction?

You or your family may have questions about addiction. It is important to understand what addiction is. Addiction **IS** a chronic brain disease that can occur in some people exposed to certain substances such as alcohol, cocaine, and opioids. Taking opioids for pain relief is not addiction. People addicted to opioids crave the opioid and use it regularly for reasons other than pain relief.

Addiction **IS NOT** when a person develops "withdrawal" (such as abdominal cramping or sweating) after the medicine is stopped quickly or the dose is reduced by a large amount. Your doctor will avoid stopping your medication suddenly by slowly reducing the amount of opioid you take before the medicine is completely stopped. Addiction also **IS NOT** what happens when some people taking opioids need to take a higher dose after a period of time in order for it to continue to relieve their pain. This normal "tolerance" to opioid medications doesn't affect everyone who takes them and does not, by itself, imply addiction. If tolerance does occur, it does not mean you will "run out" of pain relief. Your dose can be adjusted or another medicine can be prescribed.

Some questions you may have are:

*Is it wrong to take opioids for pain?*

- No. Pain relief is an important medical reason to take opioids as prescribed by your doctor. Addicts take opioids for other reasons, such as unbearable emotional problems. Taking opioids as prescribed for pain relief is not addiction.

*How can I be sure I'm not addicted?*

- Addiction to an opioid would mean that your pain has gone away but you still take the medicine regularly when you don't need it for pain, maybe just to escape from your problems.
- Ask yourself: Would I want to take this medicine if my pain went away? If you answer no, you are taking opioids for the right reasons—to relieve your pain and improve your function. You are not addicted.

## If I take the opioid now, will it work later when I really need it?

Some patients with chronic pain worry about this, but it is not a problem.

- The dose can be increased or other medicines can be added.
- You won't "run out" of pain relief.

## What can I do about side effects?

Talk to your doctor, nurse, or pharmacist about the side effects of opioids. If they occur, remember that most opioid side effects can be treated or prevented.



*Constipation*

- Constipation from opioids is very common, but it can be prevented. If it does occur, it can be treated.
- Prevention is the best approach. If you take opioids daily, you need to eat more fiber and drink more liquids than you usually do. Many people also need to take a laxative. The most common type is a combination of stool softener and mild stimulant laxative. Those that can be purchased without a prescription include Peri-Colace® capsules or syrup and Senokot-S® tablets. Ask your pharmacist about less expensive generic forms.

*Nausea or vomiting (upset stomach)*

- This does not always occur, but if it does, it can be treated. Ask your doctor, nurse, or pharmacist for medicine to relieve this. After a few days, the nausea usually stops.
- Try sitting still and breathing slowly through your mouth.
- Nausea medicines that you can buy without a prescription include Dramamine® tablets and Emetrol® oral solution.
- If your pain is under good control, you may be able to reduce the nausea by taking a lower dose of opioid.

*Drowsiness (sleepiness)*

- Some degree of sleepiness would be normal when you start taking an opioid, but after a few days the drowsiness usually goes away.

- To offset the drowsiness, try beverages that contain caffeine, such as coffee or sodas.
- If your pain is under good control, you may be able to reduce the drowsiness by taking a lower dose of opioid.
- Be careful. If you feel drowsy, do not drive a car or operate any dangerous machinery. Steady yourself when you walk.

*"Slowed breathing"*

- The medical term for "slowed breathing" is "respiratory depression."
- This is very rare when oral opioids are used appropriately for pain relief.
- If you become so sleepy that you cannot make yourself stay awake, you may be in danger of slowed breathing. Stop taking your opioid and call your doctor immediately.

## How much and how often should I take my pain medicine?

Keep on top of your pain—don't wait until pain becomes severe to take your medicine. Pain is easier to control before it reaches full force. Set a goal with your doctor or nurse for pain relief that makes it easy for you to sleep at night and to do your daily activities.

Plan a schedule with your doctor or nurse that provides enough pain medicine to keep you comfortable and that is timed to prevent you from becoming uncomfortable from pain. *Only you and your doctor or nurse can determine the proper dosing schedule for your pain.*



Your doctor or nurse may instruct you to do some of the following:

- Take the next dose before the last dose wears off. If pain is present most of the day and night, the pain medicine may be taken at regularly scheduled times. If you are taking a short-acting opioid, this usually means taking it every 4 hours. You may need to set your alarm, especially at night, to be sure you take your dose before the pain returns and wakes you up.
- If your pain comes and goes, take your pain medicine when pain first begins, before it becomes severe.
- If you are taking a long-acting opioid, you may only need to take it every 8 to 12 hours, but you may also need to take a short-acting opioid in between for any increase in pain.
- If you take an opioid regularly for longer than a week, don't suddenly stop taking it. When your therapy is complete, your doctor will slowly decrease your dose safely.

If you need to take more or less pain medicine than planned, contact your doctor to get the plan changed.

## Keeping track of your pain

- Try using the "Pain Control Record" on the last page if you have any difficulty getting relief from your pain. This will help you keep track of how well your pain medicines are working and may make it easier to explain problems to your doctor or nurse.
- Use a pain rating scale. Most people use the 0 to 10 scale or the faces scale to rate the intensity of their pain (see below).
- Set a goal for pain relief. Ask yourself what activities you need to do, such as getting out of bed, sleeping, or walking. Then decide what pain rating will make it easy for you to carry out those activities. Everyone is different, but many people need a pain rating of 3 or less to be able to function well.

See completed "Pain Control Record" on the next page for an example.

*0-10 Numeric Pain Rating Scale*




*Faces Pain Rating Scale†*




†Adapted from McCaffery M, Pasero C. *Pain: Clinical Manual*, 1999: p. 67, Mosby, Inc. Faces pain rating scale modified from Wong DL. *Whaley & Wong's Essentials of Pediatric Nursing*, 5th ed., 1997: pp. 1215-1216, Mosby, Inc.

**Example: Pain Control Record**

This is a record of how your pain medicines are working. Please keep this record until you and your nurse/doctor find the dose and frequency of medicine that provides satisfactory pain relief for you most of the time. After that, you only need to keep this record when you have problems related to your pain medicines.

Name: *John* Date: *Tuesday*

GOALS Satisfactory pain rating: *3* Activities: *care for self—perform prescribed exercises*

Prescription: *oxycodone 5mg every 4 hours as needed*

My pain rating scale: 0 (NO PAIN) 1 2 3 4 5 (MODERATE PAIN) 6 7 8 9 10 (WORST POSSIBLE PAIN)

Directions: Rate your pain before you take pain medication and 1 to 2 hours later.

| Time | Pain Rating | Medicine I took: | Side Effects (drowsy? upset stomach?) | Activities |
|---|---|---|---|---|
| *6 am* | *6* | *oxycodone 5mg* | | |
| *8 am* | *3* | | *no* | *shower, exercises* |
| *10 am* | *4* | *oxycodone 5mg* | | |
| | | | | |
| | | | | |
| | | | | |

EXAMPLE

If pain is greater than *6*, or if you have other problems with your pain medicine, call:

Nurse: Name/phone *Steve Jones 555-1111*

Doctor: Name/phone *Anne Smith 555-2222*

*Adapted with permission from McCaffery M, Pasero C: Pain: Clinical Manual, Mosby, p.87.*

The example on this page shows that the pain medicine worked to relieve the pain to the patient's goal of 3 and allowed the patient to perform the necessary activities. This patient does not need to continue to use the pain control record because the pain medicine was successful. If it had not relieved the pain down to the goal of 3 or if the patient could not perform the activities because of pain, continued use of the record would help decide what additional pain relief is necessary.

# Pain Control Record

*(May be copied for future use.)*

This is a record of how your pain medicines are working. Please keep this record until you and your nurse/doctor find the dose and frequency of medicine that provides satisfactory pain relief for you most of the time. After that, you only need to keep this record when you have problems related to your pain medicines.

Name: ______________________ Date: ______________________

GOALS Satisfactory pain rating: __________ Activities: ______________________

Prescription: ______________________ ______________________

My pain rating scale: 0 1 2 3 4 5 6 7 8 9 10

0 = NO PAIN, 5 = MODERATE PAIN, 10 = WORST POSSIBLE PAIN

Directions: Rate your pain before you take pain medication and 1 to 2 hours later.

| Time | Pain Rating | Medicine I took: | Side Effects (drowsy? upset stomach?) | Activities |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

If pain is greater than ______, or if you have other problems with your pain medicine, call:

Nurse: Name/phone ______________________

Doctor: Name/phone ______________________

*Adapted with permission from McCaffery M, Pasero C: Pain: Clinical Manual, Mosby, p.87.*

# EXHIBIT 4

# Pain Management

May 5, 2009

Dr. Ira Kornbluth MD
President Maryland Pain Society

THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS

# Intro to Pain Management

- Types of pain
- Assessment of pain
- Pharmacological treatment options
- Non-Pharmacological treatment options

THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS

# Epidemiology of Pain

- An estimated 76.5 million Americans (26%) aged 20 years and over report that they have had a problem with pain of any sort that persisted for more than 24 hours in duration (not including acute pain)
- 20% of American adults (42 million people) report that pain or physical discomfort disrupts their sleep a few nights a week or more
- Chronic pain disables more people than cancer or heart disease and costs the American people more than both combined
- The annual cost of chronic pain in the US, including healthcare expenses, lost income, and lost productivity is estimated to be $100 billion

Source: APF; Decision Resources- Chronic Pain, March 2008; National Center for Health Statistics Report: Health, US, 2006, Special Feature on Pain

THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS



Confidential

## Epidemiology of Pain

| Disease Population in the US | % Diagnosed | % Drug Treated |
|---|---|---|
| **Osteoarthritis pain** | 53 | 50 |
| **Rheumatoid arthritis pain** | 98 | 95 |
| **Cancer pain** | | |
| *Severe* | 85 | 75 |
| *Bone* | 75 | 75 |
| *Neuropathic* | 70 | 60 |
| *Breakthrough* | 80 | 75 |
| **Chronic low back pain** | 65 | 80 |
| **Fibromyalgia** | 22 | 85 |
| **HIV-related neuropathic pain** | 38 | 53 |

Source: APF; Decision Resources- Chronic Pain, March 2008; National Center for Health Statistics Report: Health, US, 2006, Special Feature on Pain

THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS

# What is Pain?

- Medical definition

  "Pain is an unpleasant sensory and emotional experience associated with actual or potential tissue damage or described in terms of such damage."

  » International Association for the Study of Pain, 1979

- Patient-Derived Definition

  "Pain is whatever the experiencing person says it is, existing whenever he/she says it does".

  » Margo McCaffrey

THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS



Confidential




Unresolved chronic pain has a negative impact on the sufferers' quality of life, affecting ability to concentrate, do their job, exercise, socialize, get a good night's sleep, perform household chores, and have sex. It affects their participation in activities, results in missed work, and is associated with fatigue, frustration, anxiety, irritability, and depression. Pain interferes with their ability to sleep, productivity, and ability to work. Some feel they cannot function as normal people and feel so bad they want to die.

**Reference**

American Pain Foundation. Pain facts. Found at: www.painfoundation.org/page.asp?file=Library/PainSurveys.htm. Accessed on October 19, 2006.

# Disability



- 86 million Americans suffer from chronic pain
- Low Back Pain
  - Leading cause of disability in adults <45
  - 3rd leading cause of disability in adults >45
  - Nearly 8 million people in US partially disabled due to LBP

Sources:
http://www.theacpa.org/nerve/about_acpa.asp
http://emedicine.medscape.com/article/310353-overview
http://www.karger.com/gazette/65/walsh/art_4_p.htm

THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS



Confidential

## Return to Work

- Less than 50% if off work for greater than 6 months
- 25% will return if > 1 year
- Nearly 0% if > 2 years



Waddell G. The clinical course of low back pain. In: *The back pain revolution*. Edinburgh: Churchill Livingstone, 1998:103–117.

THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS




THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS

## Pain Assessment

- Character
- Onset
- Location
- Duration
- Intensity
- Alleviating factors
- Exacerbating factors



CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

## Herniated Disc



THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS

## HNP/bulge on MRI

- Jensen found 64% of adults without back pain had a bulge, protrusion, or extrusion at one level
- 38% had abnormality at more than one level




Jensen MC et al. Magnetic resonance imaging of the lumbar spine in people without back pain. N Engl J Med 1994;331:69-73

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed



Confidential

## Basic Process of Normal Pain Processing




THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS





Portenoy RK, Kanner RM. Definition and Assessment of Pain. In: Portenoy RK, Kanner RM, eds. *Pain Management: Theory and Practice*. Philadelphia, Pa: FA Davis Company; 1996:4.

Galer BS, Dworkin RH. *A Clinical Guide to Neuropathic Pain*. Minneapolis, Minn: The McGraw-Hill Companies Inc; 2000:8-9.

# Nociceptive Pain
# Somatic vs. Visceral

- Somatic
  - Deep or cutaneous tissue injury; localized
  - Described as dully, achy, gnawing
  - Responsive to opioids & NSAIDs
  - Examples
    - Tumor, bone mets, fractures, muscle pulls



- Visceral
  - Organ system origin; poorly localized
  - Described as diffuse and achy
  - Responsive to opioids
  - Examples
    - Tumor infiltrate, bowel obstruction, pancreatic CA



For Training Purposes Only
Not Intended for Promotion

THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS



Confidential END00366734

## Neuropathic Pain

- Results from damage to or changes of peripheral or central nervous system
- Often described as burning, sharp, electrical, lightning symptoms

•Peripheral Neuropathies

– Diabetic, Alcohol.

•Entrapment Neuropathies

– CTS, Neuromas

•CRPS

- RSD

•Central Pain

- Post CVA Pain, MS

THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS

17

# Pain Assessment



THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS

## 5th Vital Sign

1. Temperature
2. Pulse
3. Respiration rate
4. Blood pressure
5. PAIN



THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS



Confidential

## What Are the Goals of Clinical Assessment?

- Achieve diagnosis of pain and underlying disorder
- Identify pain mechanism
- Evaluate functional status (ADLs*)
- Identify comorbid conditions
- Evaluate psychosocial factors
- Set goals
- Develop a targeted treatment plan
- Determine when to refer

*ADLs= activities of daily living

THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS

## Pain Assessment

- Pain History
  - Onset
  - Location
  - Duration
  - Radiation
  - Exacerbating factors
  - Alleviating factors
  - Describe pain quality
  - Rate pain severity
  - Affect on
    - Sleep
    - Relationships
    - ADOL
- Pain treatment history
- History of substance abuse
- Physical Exam
- Diagnostic Studies

ADOL = activities of daily living

THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS


Factors That Influence a Pain Assessment
Language Barriers
Economic Factors
Cultural Beliefs
Family Influences
THE STRENGTH WITHIN
CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed
ENDO PHARMACEUTICALS

## Pain Measurement Tools

- Pain Diary
- Visual Analog Scale (VAS)
- Verbal Numerical Scale
- Wisconsin Brief Pain Inventory (BPI)
- McGill Pain Questionnaire
- WOMAC Osteoarthritis Index
- Neuropathic Pain Scale (NPS)

THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS



Confidential




Katz N. *Clin J Pain*. 2000;16:S41-S48;
Belgrade MJ. *Postgrad Med*. 1999;106:127-148;
Kim KM et al. *J Korean Med Sci*. 2001;16:193-197;
Galer BS et al. *A Clinical Guide to Neuropathic Pain*. 2000:11,90;
Turk DC. *Clin J Pain*. 2000;16:279-280.




Ferrell B, Herr K, Epplin J, et al. The management of persistent pain in older persons. *Programs and Abstracts of the American Geriatric Society 2002 Annual Scientific Meeting*, May 8–12, 2002: Washington, DC

Kuman D, Marshall HJ. Diabetic peripheral neuropathy: amelioration of pain with transcutaneous electrostimulation. *Diabetes Care*. 1997;20:1702-1705.




1. Mackin GA. *J Hand Ther*. 1997;10:96-109.
2. Katz N. *Clin J Pain*. 2000;16:S41-S48.
3. Leland JY. *Geriatrics*. 1999;54:23-37.
4. Belgrade MJ. *Postgrad Med*. 1999;106:127-140.
5. Galer BS et al. *A Clinical Guide to Neuropathic Pain*. 2000:97.
6. Gonzales GR. *Neurology*. 1995:45(suppl 9):S11-S16.

## Medication Management

- Reversible, titratable
- Adjuvant meds treat concurrent symptoms
- Use of multiple drugs is typical in chronic pain mgmt
- Lack of invasiveness



CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

## Limitations of Pharmacotherapy

- Abuse, diversion
- Compliance
- Side effects
- If pain is localized to one region, is there a targeted treatment (e.g. injection, surgery)?



CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

# Opioid Treatment of Acute and Chronic Pain



- Use of analgesics should include

***<u>Proper patient selection</u>***

1. A proper initial assessment of the patient
2. The use of opioids as part of a comprehensive treatment plan e.g., consider non-opioid treatments as well
3. Patient reassessment- analgesia? Adverse effects? Activities of daily living? Aberrant behaviors?
4. Opioid rotation- rotation from one opioid to another can result in significant improvement in analgesia

THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS

# Overview of Current Opioid Environment

- Dichotomy currently exists:
  - Increased awareness of pain & need to treat
  - Opioids recognized as effective analgesics
  - Abuse/addiction/diversion issues raise concerns
  - Result of this dichotomy = barriers to treatment
- Need for a “balanced” approach
  - Appropriate access to pain medications
  - Proactive efforts to limit abuse, addiction, diversion

THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS

## Opioid Basics

- No ceiling dose
- No End Organ Toxicity
- Opioid tolerance will develop!!!!
- Opioid dependence may develop.
- Opioid addiction unlikely to develop.
  - –If pain exists then addiction = 1: 10,000

THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS

# Controlled Substance Act

- Scheduling due to medical use & potential for abuse
- Five schedules: C-I, C-II, C-III, C-IV, C-V
- C-I: No accepted medical use (i.e., LSD)
- C-II: Accepted med. use; high abuse potential
  - i.e., Morphine, hydromorphone, oxymorphone
- C-III: “Less” abuse vs. C-1or C-2
  - i.e., Hydrocodone w/APAP

APAP=Acetaminophen

THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS

# Definition Related to Opioid Use

- Physical Dependence
  - Defined solely by the occurrence of an abstinence syndrome on abrupt does reduction or discontinuation.
- Tolerance
  - Diminution of one or more drug effects cause by exposure of drug
- Addiction
  - Aberrant use of substance characterized by lose of control, compulsive use, and continue use despite harm to self

THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS



Confidential

| | OPANA ER | OxyContin | Avinza | Kadian |
|---|---|---|---|---|
| Active Compound | Oxymorphone | Oxycodone | Morphine | Morphine |
| Dosing | Pivotal trials demonstrate proven every 12 hour dosing that is maintained over 12 week period | Every 12 hours | Once-a-day | Once or twice-a-day |
| Half-life | IR = up to 9 hours<br>ER = up to 11.3 hours | IR = 3.2 hours<br>CR = 4.5 hours | Not listed | Not listed |
| Metabolism | Metabolized in the liver. No CYP450 drug/drug interactions at clinically relevant doses. No dose adjustment necessary for CYP3A4 or CYP 2C9-mediated interactions | CYP450 2D6 | Conjugated in the liver | Conjugated in the liver |
| Relative Potency | 10 mg | 20 mg | 30 mg | 30 mg |
| Delivery System | TIMERx-N matrix | AcroContin - biphasic | Encapsulated beads | Encapsulated pellets |

THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS

# OPANA® ER Indication

think OPANA ER
(oxymorphone HCl) CII
Extended-release tablets
5 mg, 7.5 mg, 10 mg, 15 mg, 20 mg, 30 mg, 40 mg

- OPANA ER is indicated for the relief of moderate to severe pain in patients requiring continuous, around-the-clock opioid treatment for an extended period of time
- OPANA ER is not intended for use as an as needed analgesic
- OPANA ER is not indicated for pain in the immediate post-operative period (12–24 hours following surgery) for patients not previously taking opioids because of the risk of oversedation and respiratory depression requiring reversal with opioid antagonists
- OPANA ER is not indicated for pain in the post-operative period if the pain is mild or not expected to persist for an extended period of time

THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS

35

# OPANA® ER
# Proven Durable Efficacy

- OPANA ER has demonstrated proven every 12-hour dosing
  - Patented TIMERx®-N extended-release delivers steady release of oxymorphone over the entire 12-hour dosing period
- Durable analgesic effect and significant pain relief demonstrated in opioid-naïve and opioid-experienced patients
  - Minimal increase in pain scores over a 12-week period
  - Patients successfully titrated to an effective dose
  - Maintained effective analgesic dose over the 12-week period
- Less rescue medicine use than the allowable daily maximum
  - In clinical trials, patients were allowed up to 10 mg/day of OPANA®, an immediate-release formulation
  - Average use was consistently less than the allowed 10 mg/day (7.3 mg–9.8 mg for opioid-naïve pts and 7.5 mg–8.5 mg for opioid-experienced pts)

THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS

36

# Dosing Advantages with OPANA® ER

- No known CYP450 PK drug-drug interactions at clinically relevant doses
  - Multiple concomitant medications may be a significant issue for some patients
  - Many common drugs are processed via the CYP450 pathway, therefore, no dose adjustments are required for these drugs
- Clinically studied in over 2,000 patients including studies in low back pain, osteoarthritis, and cancer pain
  - Opioid-naïve patients and opioid-experienced patients
- Multiple strengths, multiple formulations of oxymorphone
  - Ease of initiation of therapy
  - Ease of conversion within the OPANA® brand family
  - Flexibility when converting from other opioids

THE STRENGTH WITHIN

CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed

ENDO PHARMACEUTICALS




•The outcome measures I have used to organize the results reported in the literature are reduction in pain, discontinued or greatly reduced consumption of oral analgesics, enhanced performance of activities of daily living, return to work and other functional ability outcomes.


Treatment Precipitating Injury
Interventional Techniques
Analgesics
GOAL FUNCTIONAL REHABILITATION
Physical therapy
Adjuvant Medications
Psychological Psychiatric Therapy
THE STRENGTH WITHIN
CONFIDENTIAL- for internal training purposes only.
Not to be used in promotion with customers. Not to be distributed
ENDO PHARMACEUTICALS

IN THE COUNTY COURT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO. 2020-021353-CC-25

SERIES 17-03-615, a designated series of MSP Recovery Claims, Series LLC, a Delaware Series limited liability company,

Plaintiffs,

v.

PAR PHARMACEUTICAL, a Delaware corporation, and ENDO HEALTH SOLUTIONS, INC., a Delaware corporation, ENDO PHARMACEUTICALS, INC., a Delaware corporation, HOLIDAY CVS, LLC, a Florida corporation, CVS PHARMACY, INC., a Rhode Island corporation, and CVS HEALTH CORPORATION, a Delaware corporation,

Defendant.

______________________________________________/

**PLAINTIFFS' NOTICE OF UNAVAILABILITY**

PLEASE TAKE NOTICE that undersigned counsel for Plaintiffs SERIES 17-03-615, will be closing their offices and unavailable for the period beginning from December 24, 2020 through January 4, 2021. The undersigned respectfully requests that no depositions or hearings be scheduled during that time period, and that any such matters that have been scheduled for said time period be re-scheduled to a time and date mutually convenient to all counsel.

Dated: December 23, 2020

Respectfully submitted,

**MSP RECOVERY LAW FIRM**
*Attorneys for Plaintiff*
2701 S Lejeune Road 10th Floor,
Coral Gables, Florida, 33134
Phone: (305) 614-2222
Serve: serve@msprecoverylawfirm.com

By: */s/ John H. Ruiz*
John H. Ruiz, Fla. Bar. 928150
jruiz@msprecoverylawfirm.com

Frank C. Quesada, Fla. Bar No. 29411
fquesada@msprecoverylawfirm.com
John W. Cleary, Fla. Bar No. 118137
jcleary@msprecoverylawfirm.com

**Armas Bertran Zincone**
*Attorneys for Plaintiff*
4960 SW 72 Avenue, Ste. 206
Miami, Florida 33155
Phone: 305-661-2021

Eduardo E. Bertran, FBN: 94087
ebertran@armaslaw.com
Francesco A. Zincone, III, FBN: 100096
fzincone@armaslaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was filed electronically and was sent by e-mail from the Florida Courts' E-Filing Portal system on December 23, 2020, on all counsel or parties of record.

By: */s/ John H. Ruiz*
John H. Ruiz, Esq.

Filing # 119296118 E-Filed 01/08/2021 12:05:58 PM

☐ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☑ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☑ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE**<br>**(a) GENERAL FORMS** | 2020-021353-CC-25 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | SERVICE |
|---|---|---|
| SERIES 17-03-615, a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company, | PAR PHARMACEUTICAL, a Delaware corporation, and ENDO HEALTH SOLUTIONS, INC., a Delaware corporation, ENDO PHARMACEUTICALS, INC., a Delaware corporation, HOLIDAY CVS, LLC, a Florida corporation, CVS PHARMACY, INC., a Rhode Island corporation, and CVS HEALTH CORPORATION, | |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): PAR PHARMACEUTICAL, INC.

c/o The Corporation Trust Company as Registered Agent

Corporation Trust Center, 1209 Orange ST

Wilmington, DE 19801

CLOCK IN

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's Attorney: John H. Ruiz, Esq.

whose address is: MSP Recovery Law Firm

2701 S. Le Jeune Road, 10th Floor

Coral Gables, FL 33134

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| **HARVEY RUVIN**<br>**CLERK of COURTS** | DEPUTY CLERK | DATE |
|---|---|---|

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

☐ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☑ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☑ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE**<br>**(a) GENERAL FORMS** | 2020-021353-CC-25 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | SERVICE |
|---|---|---|
| SERIES 17-03-615, a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company, | PAR PHARMACEUTICAL, a Delaware corporation, and ENDO HEALTH SOLUTIONS, INC., a Delaware corporation, ENDO PHARMACEUTICALS, INC., a Delaware corporation, HOLIDAY CVS, LLC, a Florida corporation, CVS PHARMACY, INC., a Rhode Island corporation, and CVS HEALTH CORPORATION, | |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): ENDO HEALTH SOLUTIONS, INC.

c/o The Corporation Trust Company as Registered Agent

Corporation Trust Center, 1209 Orange ST

Wilmington, DE 19801

**CLOCK IN**

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's Attorney: John H. Ruiz, Esq.

whose address is: MSP Recovery Law Firm

2701 S. Le Jeune Road, 10th Floor

Coral Gables, FL 33134

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| **HARVEY RUVIN**<br>**CLERK of COURTS** | DEPUTY CLERK | DATE |
|---|---|---|

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

☐ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☑ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☑ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE**<br>**(a) GENERAL FORMS** | 2020-021353-CC-25 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | SERVICE |
|---|---|---|
| SERIES 17-03-615, a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company, | PAR PHARMACEUTICAL, a Delaware corporation, and ENDO HEALTH SOLUTIONS, INC., a Delaware corporation, ENDO PHARMACEUTICALS, INC., a Delaware corporation, HOLIDAY CVS, LLC, a Florida corporation, CVS PHARMACY, INC., a Rhode Isla corporation, and CVS HEALTH CORPORATION, | |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): ENDO PHARMACEUTICALS, INC.

c/o The Corporation Trust Company as Registered Agent

Corporation Trust Center, 1209 Orange ST

Wilmington, DE 19801

CLOCK IN

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's Attorney: John H. Ruiz, Esq.

whose address is: MSP Recovery Law Firm

2701 S. Le Jeune Road, 10th Floor

Coral Gables, FL 33134

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| HARVEY RUVIN<br>CLERK of COURTS | DEPUTY CLERK | DATE |
|---|---|---|

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

☐ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☑ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☑ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE**<br>**(a) GENERAL FORMS** | 2020-021353-CC-25 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | SERVICE |
|---|---|---|
| SERIES 17-03-615, a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company, | PAR PHARMACEUTICAL, a Delaware corporation, and ENDO HEALTH SOLUTIONS, INC., a Delaware corporation, ENDO PHARMACEUTICALS, INC., a Delaware corporation, HOLIDAY CVS, LLC, a Florida corporation, CVS PHARMACY, INC., a Rhode Island c orporation, and CVS HEALTH CORPORATION, | |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): HOLIDAY CVS, LLC

c/o C T Corporation System

1200 South Pine Island Road

Plantation, FL 33324

CLOCK IN

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's Attorney: John H. Ruiz, Esq.

whose address is: MSP Recovery Law Firm

2701 S. Le Jeune Road, 10th Floor

Coral Gables, FL 33134

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| **HARVEY RUVIN**<br>**CLERK of COURTS** | DEPUTY CLERK | DATE |
|---|---|---|

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

☐ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☑ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☑ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE**<br>**(a) GENERAL FORMS** | 2020-021353-CC-25 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | SERVICE |
|---|---|---|
| SERIES 17-03-615, a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company, | PAR PHARMACEUTICAL, a Delaware corporation, and ENDO HEALTH SOLUTIONS, INC., a Delaware corporation, ENDO PHARMACEUTICALS, INC., a Delaware corporation, HOLIDAY CVS, LLC, a Florida corporation, CVS PHARMACY, INC., a Rhode Island corporation, and CVS HEALTH CORPORATION, | |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): CVS PHARMACY INC.

c/o The Corporation Trust Company as Registered Agent

Corporation Trust Center, 1209 Orange ST

Wilmington, DE 19801

CLOCK IN

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's Attorney: John H. Ruiz, Esq.

whose address is: MSP Recovery Law Firm

2701 S. Le Jeune Road, 10th Floor

Coral Gables, FL 33134

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| | | |
|---|---|---|
| **HARVEY RUVIN**<br>**CLERK of COURTS** | DEPUTY CLERK | DATE |

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

Filing # 119296118 E-Filed 01/08/2021 12:05:58 PM

☐ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☑ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☑ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE**<br>**(a) GENERAL FORMS** | 2020-021353-CC-25 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | SERVICE |
|---|---|---|
| SERIES 17-03-615, a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company, | PAR PHARMACEUTICAL, a Delaware corporation, and ENDO HEALTH SOLUTIONS, INC., a Delaware corporation, ENDO PHARMACEUTICALS, INC., a Delaware corporation, HOLIDAY CVS, LLC, a Florida corporation, CVS PHARMACY, INC., a Rhode Island corporation, and CVS HEALTH CORPORATION, | |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): CVS HEALTH CORPORATION

c/o The Corporation Trust Company as Registered Agent

Corporation Trust Center, 1209 Orange ST

Wilmington, DE 19801

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's Attorney: John H. Ruiz, Esq.

whose address is: MSP Recovery Law Firm

2701 S. Le Jeune Road, 10th Floor

Coral Gables, FL 33134

CLOCK IN

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| **HARVEY RUVIN**<br>**CLERK of COURTS** | DEPUTY CLERK | DATE |
|---|---|---|

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

☐ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☑ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☑ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE**<br>**(a) GENERAL FORMS** | 2020-021353-CC-25 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | SERVICE |
|---|---|---|
| SERIES 17-03-615, a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company, | PAR PHARMACEUTICAL, a Delaware corporation, and ENDO HEALTH SOLUTIONS, INC., a Delaware corporation, ENDO PHARMACEUTICALS, INC., a Delaware corporation, HOLIDAY CVS, LLC, a Florida corporation, CVS PHARMACY, INC., a Rhode Island corporation, and CVS HEALTH CORPORATION, | |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): PAR PHARMACEUTICAL, INC.

c/o The Corporation Trust Company as Registered Agent

Corporation Trust Center, 1209 Orange ST

Wilmington, DE 19801

CLOCK IN

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's Attorney: John H. Ruiz, Esq.

whose address is: MSP Recovery Law Firm

2701 S. Le Jeune Road, 10th Floor

Coral Gables, FL 33134

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| **HARVEY RUVIN**<br>**CLERK of COURTS** | Gloria M. Reyes<br>gloriar<br>DEPUTY CLERK | DATE<br>1/12/2021 |
|---|---|---|

# AMERICANS WITH DISABILITIES ACT OF 1990
# ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

Filing # 119296118 E-Filed 01/08/2021 12:05:58 PM

☐ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☑ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☑ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE**<br>**(a) GENERAL FORMS** | 2020-021353-CC-25 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | SERVICE |
|---|---|---|
| SERIES 17-03-615, a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company, | PAR PHARMACEUTICAL, a Delaware corporation, and ENDO HEALTH SOLUTIONS, INC., a Delaware corporation, ENDO PHARMACEUTICALS, INC., a Delaware corporation, HOLIDAY CVS, LLC, a Florida corporation, CVS PHARMACY, INC., a Rhode Island corporation, and CVS HEALTH CORPORATION, | |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): ENDO HEALTH SOLUTIONS, INC.

c/o The Corporation Trust Company as Registered Agent

Corporation Trust Center, 1209 Orange ST

Wilmington, DE 19801

CLOCK IN

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's Attorney: John H. Ruiz, Esq.

whose address is: MSP Recovery Law Firm

2701 S. Le Jeune Road, 10th Floor

Coral Gables, FL 33134

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| | | DATE |
|---|---|---|
| **HARVEY RUVIN**<br>**CLERK of COURTS** | Gloria M Reyes<br>gloriar<br>DEPUTY CLERK | 1/12/2021 |

CIRCUIT AND COUNTY COURTS CLERK MIAMI-DADE COUNTY, FLORIDA IN GOD WE TRUST

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

☐ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☑ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
| --- | --- | --- |
| ☑ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE**<br>**(a) GENERAL FORMS** | 2020-021353-CC-25 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | SERVICE |
| --- | --- | --- |
| SERIES 17-03-615, a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company, | PAR PHARMACEUTICAL, a Delaware corporation, and ENDO HEALTH SOLUTIONS, INC., a Delaware corporation, ENDO PHARMACEUTICALS, INC., a Delaware corporation, HOLIDAY CVS, LLC, a Florida corporation, CVS PHARMACY, INC., a Rhode Isla corporation, and CVS HEALTH CORPORATION, | |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): ENDO PHARMACEUTICALS, INC.

c/o The Corporation Trust Company as Registered Agent

Corporation Trust Center, 1209 Orange ST

Wilmington, DE 19801

CLOCK IN

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's Attorney: John H. Ruiz, Esq.

whose address is: MSP Recovery Law Firm

2701 S. Le Jeune Road, 10th Floor

Coral Gables, FL 33134

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| **HARVEY RUVIN**<br>**CLERK of COURTS** | Gloria M Reyes<br>gloriar<br>DEPUTY CLERK | DATE<br>1/12/2021 |
| --- | --- | --- |

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

Filing # 119296118 E-Filed 01/08/2021 12:05:58 PM

☐ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☑ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☑ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE**<br>**(a) GENERAL FORMS** | 2020-021353-CC-25 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | SERVICE |
|---|---|---|
| SERIES 17-03-615, a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company, | PAR PHARMACEUTICAL, a Delaware corporation, and ENDO HEALTH SOLUTIONS, INC., a Delaware corporation, ENDO PHARMACEUTICALS, INC., a Delaware corporation, HOLIDAY CVS, LLC, a Florida corporation, CVS PHARMACY, INC., a Rhode Island c orporation, and CVS HEALTH CORPORATION, | |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): HOLIDAY CVS, LLC

c/o C T Corporation System

1200 South Pine Island Road

Plantation, FL 33324

CLOCK IN

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's Attorney: John H. Ruiz, Esq.

whose address is: MSP Recovery Law Firm

2701 S. Le Jeune Road, 10th Floor

Coral Gables, FL 33134

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| **HARVEY RUVIN**<br>**CLERK of COURTS** | Gloria M Reyes<br>gloriag<br>DEPUTY CLERK | DATE<br>1/12/2021 |
|---|---|---|

CIRCUIT AND COUNTY COURTS · CLERK · IN GOD WE TRUST · MIAMI-DADE COUNTY, FLORIDA

**AMERICANS WITH DISABILITIES ACT OF 1990**
**ADA NOTICE**

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

☐ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☑ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☑ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE**<br>**(a) GENERAL FORMS** | 2020-021353-CC-25 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | SERVICE |
|---|---|---|
| SERIES 17-03-615, a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company, | PAR PHARMACEUTICAL, a Delaware corporation, and ENDO HEALTH SOLUTIONS, INC., a Delaware corporation, ENDO PHARMACEUTICALS, INC., a Delaware corporation, HOLIDAY CVS, LLC, a Florida corporation, CVS PHARMACY, INC., a Rhode Island corporation, and CVS HEALTH CORPORATION, | |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): CVS PHARMACY INC.

c/o The Corporation Trust Company as Registered Agent

Corporation Trust Center, 1209 Orange ST

Wilmington, DE 19801

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's Attorney: John H. Ruiz, Esq.

whose address is: MSP Recovery Law Firm

2701 S. Le Jeune Road, 10th Floor

Coral Gables, FL 33134

CLOCK IN

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| HARVEY RUVIN<br>CLERK of COURTS | Gloria M Reyes<br>gloriar<br>DEPUTY CLERK | DATE<br>1/12/2021 |
|---|---|---|

**AMERICANS WITH DISABILITIES ACT OF 1990**
**ADA NOTICE**

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

☐ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☑ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☑ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE**<br>**(a) GENERAL FORMS** | 2020-021353-CC-25 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | SERVICE |
|---|---|---|
| SERIES 17-03-615, a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company, | PAR PHARMACEUTICAL, a Delaware corporation, and ENDO HEALTH SOLUTIONS, INC., a Delaware corporation, ENDO PHARMACEUTICALS, INC., a Delaware corporation, HOLIDAY CVS, LLC, a Florida corporation, CVS PHARMACY, INC., a Rhode Island corporation, and CVS HEALTH CORPORATION, | |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): CVS HEALTH CORPORATION
c/o The Corporation Trust Company as Registered Agent
Corporation Trust Center, 1209 Orange ST
Wilmington, DE 19801

CLOCK IN

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's Attorney: John H. Ruiz, Esq.

whose address is: MSP Recovery Law Firm
2701 S. Le Jeune Road, 10th Floor
Coral Gables, FL 33134

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| HARVEY RUVIN<br>CLERK of COURTS | Gloria M Reyes<br>gloriar<br>DEPUTY CLERK | DATE<br>1/12/2021 |
|---|---|---|

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

RETURN OF SERVICE

**State of Florida** | **County of DADE** | **County Court**

Case Number: 2020-021353-CC-25

FLA2021000129

Plaintiff:
**SERIES 17-03-615 A DESIGNATED SERIES OF MSP RECOVERY CLAIMS, ET AL**
vs.
Defendant:
**PAR PHARMACEUTICALS, A DELAWARE CORPORATION, ET AL**

For: John Ruiz, Esq.
MSP RECOVERY LAW, FIRM

Received by National Attorney Solutions, Inc. on the 20th day of January, 2021 at 10:14 am to be served on **CVS HEALTH CORPORATION C/O CORPORATION TRUST COMPANY AS REGISTERED AGENT, 1209 ORANGE STREET, WILMINGTON, DE 19801**. I, Mark C. Trimble, do hereby affirm that on the 28th day of January, 2021 at 1:34 p.m., executed service by delivering a true copy of the **Summons 20 Day Corporate Service and Plaintiff's Complaint for Damages Against Defendants and Exhibit 1, 2, 3 & 4** in accordance with state statutes in the manner marked below:

( ) PUBLIC AGENCY: By serving ____________ as ____________ of the within-named agency.

( ) SUBSTITUTE SERVICE: By serving ____________ as ____________.

(✓) CORPORATE SERVICE: By serving Amy McLaren as Operations Manager.

( ) OTHER SERVICE: As described in the Comments below by serving ____________ as ____________.

( ) NON SERVICE: For the reason detailed in the Comments below.

**COMMENTS:** ____________

I certify that I have no interest in the above action, am of legal age and have proper authority in the jurisdiction in which this service was made.

[signature]

PROCESS SERVER # N/A
Appointed in accordance with State Statutes

**National Attorney Solutions, Inc.**
**P.O. Box 144255**
**Coral Gables, FL 33114**
**(305) 300-2718**

Our Job Serial Number: 2021000129

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.1r

**State of Florida** County of DADE **County Court**

Case Number: 2020-021353-CC-25

FLA2021000128

Plaintiff:
**SERIES 17-03-615 A DESIGNATED SERIES OF MSP RECOVERY CLAIMS, ET AL**
vs.
Defendant:
**PAR PHARMACEUTICALS, A DELAWARE CORPORATION, ET AL**

For: John Ruiz, Esq.
MSP RECOVERY LAW, FIRM

Received by National Attorney Solutions, Inc. on the 20th day of January, 2021 at 10:14 am to be served on **CVS PHARMACY INC C/O CORPORATION TRUST COMPANY AS REGISTERED AGENT, 1209 ORANGE STREET, WILMINGTON, DE 19801**. I, Mark C. Trimble, do hereby affirm that on the 28th day of January, 2021 at 1:34pm., executed service by delivering a true copy of the **Summons 20 Day Corporate Service and Plaintiff's Complaint for Damages Against Defendants and Exhibit 1, 2, 3 & 4** in accordance with state statutes in the manner marked below:

( ) PUBLIC AGENCY: By serving ____________ as ____________ of the within-named agency.

( ) SUBSTITUTE SERVICE: By serving ____________ as ____________.

(✓) CORPORATE SERVICE: By serving Amy McLaren as Operations Manager.

( ) OTHER SERVICE: As described in the Comments below by serving ____________ as ____________.

( ) NON SERVICE: For the reason detailed in the Comments below.

**COMMENTS:** ____________

I certify that I have no interest in the above action, am of legal age and have proper authority in the jurisdiction in which this service was made.

[signature]

PROCESS SERVER # N/A
Appointed in accordance with State Statutes

**National Attorney Solutions, Inc.**
**P.O. Box 144255**
**Coral Gables, FL 33114**
**(305) 300-2718**

Our Job Serial Number: 2021000128

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.1r

Filing # 120687544 E-Filed 02/02/2021 03:46:19 PM

RETURN OF SERVICE

**State of Florida** | **County of DADE** | **County Court**

Case Number: 2020-021353-CC-25

FLA2021000127

Plaintiff:
**SERIES 17-03-615 A DESIGNATED SERIES OF MSP RECOVERY CLAIMS, ET AL**
vs.
Defendant:
**PAR PHARMACEUTICALS, A DELAWARE CORPORATION, ET AL**

For: John Ruiz, Esq.
MSP RECOVERY LAW, FIRM

Received by National Attorney Solutions, Inc. on the 20th day of January, 2021 at 10:14 am to be served on **ENDO HEALTH SOLUTIONS INC. C/O CORPORATION TRUST COMPANY AS REGISTERED AGENT, 1209 ORANGE STREET, WILMINGTON, DE 19801**. I, Mark C. Trimble, do hereby affirm that on the 28th day of January, 2021 at 1:34p.m., executed service by delivering a true copy of the **Summons 20 Day Corporate Service and Plaintiff's Complaint for Damages Against Defendants and Exhibit 1, 2, 3 & 4** in accordance with state statutes in the manner marked below:

( ) PUBLIC AGENCY: By serving ____________ as ____________ of the within-named agency.

( ) SUBSTITUTE SERVICE: By serving ____________ as ____________.

(✓) CORPORATE SERVICE: By serving Amy McLaren as Operations Manager.

( ) OTHER SERVICE: As described in the Comments below by serving ____________ as ____________.

( ) NON SERVICE: For the reason detailed in the Comments below.

**COMMENTS:** ____________

I certify that I have no interest in the above action, am of legal age and have proper authority in the jurisdiction in which this service was made.

[signature]
PROCESS SERVER # N/A
Appointed in accordance with State Statutes

**National Attorney Solutions, Inc.**
**P.O. Box 144255**
**Coral Gables, FL 33114**
**(305) 300-2718**

Our Job Serial Number: 2021000127

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.1r

Filing # 120687544 E-Filed 02/02/2021 03:46:19 PM

**State of Florida** **County of DADE** **County Court**

Case Number: 2020-021353-CC-25

FLA2021000126

Plaintiff:
**SERIES 17-03-615 A DESIGNATED SERIES OF MSP RECOVERY CLAIMS, ET AL**
vs.
Defendant:
**PAR PHARMACEUTICALS, A DELAWARE CORPORATION, ET AL**

For: John Ruiz, Esq.
MSP RECOVERY LAW, FIRM

Received by National Attorney Solutions, Inc. on the 20th day of January, 2021 at 10:14 am to be served on **ENDO PHARMACEUTICALS INC. C/O CORPORATION TRUST COMPANY AS REGISTERED AGENT, 1209 ORANGE STREET, WILMINGTON, DE 19801**. I, Mark C. Tranchi, do hereby affirm that on the 28th day of January, 2021 at 1:34 p.m., executed service by delivering a true copy of the **Summons 20 Day Corporate Service and Plaintiff's Complaint for Damages Against Defendants and Exhibit 1, 2, 3 & 4** in accordance with state statutes in the manner marked below:

( ) PUBLIC AGENCY: By serving ______ as ______ of the within-named agency.

( ) SUBSTITUTE SERVICE: By serving ______ as ______.

(✓) CORPORATE SERVICE: By serving Amy McLaren as Operations Manager.

( ) OTHER SERVICE: As described in the Comments below by serving ______ as ______.

( ) NON SERVICE: For the reason detailed in the Comments below.

**COMMENTS:** ______

I certify that I have no interest in the above action, am of legal age and have proper authority in the jurisdiction in which this service was made.

[signature]

PROCESS SERVER # N/A
Appointed in accordance with State Statutes

**National Attorney Solutions, Inc.**
**P.O. Box 144255**
**Coral Gables, FL 33114**
**(305) 300-2718**

Our Job Serial Number: 2021000126

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.1r

**State of Florida** | **County of DADE** | **County Court**

Case Number: 2020-021353-CC-25

FLA2021000130

Plaintiff:
**SERIES 17-03-615 A DESIGNATED SERIES OF MSP RECOVERY CLAIMS, ET AL**

vs.

Defendant:
**PAR PHARMACEUTICALS, A DELAWARE CORPORATION, ET AL**

For:
John Ruiz, Esq.
MSP RECOVERY LAW, FIRM
2701 S. Lejeune Road
10 Floor
Coral Gables, FL 33134

Received by National Attorney Solutions, Inc. on the 20th day of January, 2021 at 10:14 am to be served on **HOLIDAY CVS LLC C/O CT CORPORATION SYSTEM, 1200 SOUTH PINE ISLAND RD., PLANTATION, FL 33324**.

I, Brian Hall, do hereby affirm that on the **27th day of January, 2021** at **11:45 am, I:**

served a **CORPORATION** by delivering a true copy of the **Summons 20 Day Corporate Service and Plaintiff's Complaint for Damages Against Defendants and Exhibit 1, 2, 3 & 4** with the date and hour of service endorsed thereon by me, to: **DONNA MOCH** as **CT CORP. MANAGER** for **HOLIDAY CVS LLC**, at the address of: **1200 SOUTH PINE ISLAND RD., PLANTATION, FL 33324**, and informed said person of the contents therein, in compliance with state statutes 48.081(1) a,b,c,d,(2) (3) a,b (4) (5),48.091(1)(2) and 48.031(2b).

I certify that I am over the age of 18, have no interest in the above action, and am a Certified Process Server, in good standing, in the Judicial Circuit in which the process was served.

**Brian Hall**
1216

**National Attorney Solutions, Inc.**
**P.O. Box 144255**
**Coral Gables, FL 33114**
**(305) 300-2718**

Our Job Serial Number: FLA-2021000130

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.1r

**State of Florida** | **County of DADE** | **County Court**

Case Number: 2020-021353-CC-25

FLA2021000125

Plaintiff:
**SERIES 17-03-615 A DESIGNATED SERIES OF MSP RECOVERY CLAIMS, ET AL**
vs.
Defendant:
**PAR PHARMACEUTICALS, A DELAWARE CORPORATION, ET AL**

For: John Ruiz, Esq.
MSP RECOVERY LAW, FIRM

Received by National Attorney Solutions, Inc. on the 20th day of January, 2021 at 10:14 am to be served on **PAR PHARMACEUTICALS INC. C/O CORPORATION TRUST COMPANY AS REGISTERED AGENT, 1209 ORANGE STREET, WILMINGTON, DE 19801**. I, Mark A. Trimble, do hereby affirm that on the 28th day of January, 2021 at 1:34 p.m., executed service by delivering a true copy of the **Summons 20 Day Corporate Service and Plaintiff's Complaint for Damages Against Defendants and Exhibit 1, 2, 3 & 4** in accordance with state statutes in the manner marked below:

( ) PUBLIC AGENCY: By serving ______ as ______ of the within-named agency.

( ) SUBSTITUTE SERVICE: By serving ______ as ______.

(✓) CORPORATE SERVICE: By serving Amy McLaren as Operations Manager.

( ) OTHER SERVICE: As described in the Comments below by serving ______ as ______.

( ) NON SERVICE: For the reason detailed in the Comments below.

**COMMENTS:** ______

I certify that I have no interest in the above action, am of legal age and have proper authority in the jurisdiction in which this service was made.

[signature]

PROCESS SERVER # N/A
Appointed in accordance with State Statutes

**National Attorney Solutions, Inc.**
**P.O. Box 144255**
**Coral Gables, FL 33114**
**(305) 300-2718**

Our Job Serial Number: 2021000125

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.1r

Filing # 121509735 E-Filed 02/17/2021 07:56:10 AM

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2020-021353-CC-25
SECTION: CG02
JUDGE: Elijah A. Levitt

**SERIES 17-03-615**
Plaintiff(s) / Petitioner(s)

vs.

**PAR PHARMACEUTICALS, INC. et al**
Defendant(s) / Respondent(s)
______________________________/

**AGREED ORDER ON EXTENSION OF TIME TO RESPOND TO COMPLAINT**

THIS CAUSE having come before the Court upon agreement of all counsel and being otherwise duly advised in the premises, it is hereby ORDERED and ADJUDGED that all Defendants shall have up to and including 30 days from the entry of this Order within which to answer, move or otherwise respond to Plaintiff's Complaint.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 17th day of February, 2021.

2020-021353-CC-25 02-17-2021 7:50 AM

2020-021353-CC-25 02-17-2021 7:50 AM
Hon. Elijah A. Levitt

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**

Amy Furness, afurness@carltonfields.com
EDUARDO BERTRAN, EBERTRAN@ARMASLAW.COM
FRANCESCO ZINCONE, FZINCONE@ARMASLAW.COM
JOHN CLEARY, jcleary@msprecoverylawfirm.com
JOHN CLEARY, aalvarez@msprecoverylawfirm.com
JOHN H RUIZ, jruiz@msprecoverylawfirm.com
JOHN H RUIZ, serve@msprecoverylawfirm.com
JOHN H RUIZ, jruiz@msprecovery.com
MICHAEL SALVIANO, MSALVIANO@GEDLAWYERS.COM
Mayela Navarrete, mnavarrete@carltonfields.com

**Physically Served:**